COMMONWEALTH *vs.* JOSEPH SUBILOSKY.

Worcester.   January 3, 1967. — March 3, 1967.

Present: WILKINS, C.J., SPALDING, WHITTEMORE, KIRK, & SPIEGEL, JJ.

*Jury and Jurors.   Practice, Criminal,* Examination of jurors, Plea of co-
    defendant, Mistrial, Appeal with assignments of error, Sentence, Judg-
    ment, Argument to jury.   *Evidence,* Contradiction of witness, On cross-
    examination, Competency, Leading question, Offer of proof, Relevancy
    and materiality, Judicial discretion, Previous criminal charge.   *Larceny.
    Motor Vehicle,* Larceny.

The questioning of prospective jurors at a murder trial, other than as re-
    quired by G. L. c. 234, § 28, and c. 278, § 3, rests wholly in the discretion
    of the judge.   [158]

After a prospective juror at a murder trial had disclosed that he was re-
    lated to the victim and had been excused, the judge was not required to
    discharge the entire venire on the ground that such prospective juror
    had been sequestered with the other prospective jurors for several days.
    [158–159]

Where a prospective juror at a murder trial stated that he would not be
    precluded from rendering a true verdict on the evidence by an opinion
    which he had or by anything he had read or heard about the case, there
    was no abuse of discretion in a refusal by the judge to inquire what the
    prospective juror's opinion was and what he had discussed or read
    about the case.   [159–160]

There was no merit in an exception taken by the defendant at a murder
    trial to the judge's excusing a prospective juror who had stated that she
    did not believe in the death penalty.   [160]

A defendant in a criminal case was not prejudiced by acceptance of pleas
    of guilty by codefendants after empanelling of the jury.   [162]

A defendant in a criminal case who stood trial after all his codefendants
    had pleaded guilty following the empanelling of the jury was not en-
    titled to a declaration of mistrial on the ground that during the em-
    panelling counsel for one of the codefendants, in asking for a change of
    venue, had said that there could not be a fair trial in the county in
    which the case was pending.   [161–162]

After a witness in a criminal case had testified on cross-examination as
    to having talked with certain persons about a material point in the case,
    there was on the record no error in excluding further questions as to
    similar conversations with others.   [162]

On the record of a criminal case, there was no prejudicial error in ex-
    cluding a question by the defendant to a witness as to "why" there had
    been a "change in . . . [his] testimony."   [163]

At the trial of indictments arising from a bank robbery alleged to have been perpetrated by the defendant and others, where there was evidence as to certain head gear found in an automobile in which the robbers fled after the robbery, no error appeared in sundry rulings by the judge admitting or excluding testimony as to head gear worn by the defendant. [163–165]

After an indictment had been placed on file with the consent of the defendant, so that there was no sentence constituting a judgment, nothing was brought before this court by an appeal with an assignment of error based on denial of a motion for a directed verdict by the defendant. [165]

Evidence that in a bank robbery the cash was taken from the cash drawers of two tellers did not require that a verdict be directed for the defendant on an indictment charging him with larceny from the person of the acting manager of the bank, who was present in the banking room at the time of the robbery.   [165–166]

Evidence warranted conviction of the defendant on an indictment charging him with larceny of a stolen automobile in which he and others went to a bank where they perpetrated a robbery and in which they fled after the robbery.   [166]

On the record of the trial of indictments arising from a bank robbery in the course of which an employee of the bank was shot and killed by a bullet fired from a gun previously purchased by the defendant and said by him to have been lent to another, no error appeared in the exclusion, without an offer of proof, of a question to the defendant by his counsel as to "why . . . [he had] purchased that gun."   [167]

Testimony by the defendant in a criminal case admitting that he had been "in a great deal of difficulty with the police" and had been imprisoned "a substantial amount of time" did not preclude admission under G. L. c. 233, § 21, of evidence of prior convictions of the defendant.   [167]

On the record of a criminal trial, no prejudice to the defendant appeared in a certain comment by the prosecutor in closing argument prompted by a portion of the closing argument by the defendant's counsel.   [167–168]

THIRTEEN INDICTMENTS found and returned on September 16, 1965.

The cases were tried in the Superior Court before *Noonan, J.*

*Joseph J. Balliro (Genero L. Morte* with him) for the defendant.

*John F. Driscoll,* Assistant District Attorney (*Manual Morse,* Assistant District Attorney, with him), for the Commonwealth.

WHITTEMORE, J.   The defendant has appealed, under provisions of G. L. c. 278, §§ 33A–33G, from his conviction in the Superior Court for Worcester County on thirteen in-

dictments, charging him with murder in the first degree (No. 24,369), armed robbery (Nos. 24,368, 24,370, 24,371), putting various individuals in fear (Nos. 24,372, 24,373, 24,374), assault with a dangerous weapon (Nos. 24,375, 24,376, 24,377), carrying a firearm without authority (No. 24,379), larceny of a motor vehicle (No. 24,378), and breaking and entering and larceny in the daytime (No. 24,380). An indictment charging conspiracy to commit larceny was placed on file with the defendant's consent. The jury having recommended that the sentence of death not be imposed, the defendant was sentenced to imprisonment for the term of his life. The court directed that the other sentences imposed on the defendant be served concurrently with the life sentence.

The evidence permitted the jury to find these facts. Approximately 6:30 p.m. on August 27, 1965, four men (some witnesses said three) got out of a stolen automobile and entered a branch office of the Worcester County Institution for Savings, on West Boylston Street in Worcester. The intruders announced a holdup and ordered all persons in the bank to lie on the floor. The defendant, later identified as the killer by one of the tellers, Mrs. Judith M. Dillon, pointed a gun at the bank manager, Pasquale J. Lombardi, and fired the bullet that entered his head, resulting in his death. The robbers made their escape in the stolen car. A pursuing police cruiser, responding to an alarm set off by one of the bank employees, was not far behind. The escape car crashed into a tree at some distance from the bank on another street. Shortly after hearing the crash, occupants of a nearby house saw three men running in a direction away from the damaged vehicle. The police thereafter captured three men not far from the scene. The defendant was not among the three. The defence being an alibi, the defendant relied on such of the testimony as tended to show that the robbers were only three in number.[1]

Several police officers observed the defendant in down-

---

[1] Two tellers, Mrs. Dillon and Joseph Prachniak, Jr., testified to four. Prachniak saw four get out of the car. A bystander, however, saw only three men leave the automobile. A gas station employee saw three men run from

Commonwealth *v.* Subilosky.

town Worcester approximately four hours after the robbery. He appeared to have been drinking; he was wearing a straw hat, described by various witnesses as a golf hat or Alpine hat, and he was carrying a round bottle of liquor labeled "J. W. Dant." The bottle had been stolen from the home of Dr. Jarrel G. Burrow, on Massachusetts Avenue, Worcester.

The defendant, on the evening of the robbery, went to the home of Mrs. Miriam Hebert, an acquaintance, and remained there overnight. She and her son drove the defendant to Northboro the following day. While with Mrs. Hebert, the defendant told her that he had been involved in the bank holdup but had not shot the bank manager. His incriminating admissions, if believed, placed him and three others in the bank and in the escaping group.[2] The defend-

the bank and enter the car, then he saw a fourth on the steps and saw four in the departing car. Another bystander saw three men coming out of the bank. Still another bystander saw one of the group run to the back door of the bank and pull a man back into the building. Mrs. Margaret Foss saw three men come out of the bank and enter the car and saw the car leave with the three. Very shortly after the crash four members of the family of Robert E. Bennett saw three men running in the same direction away from the car, the nearest being about twenty yards from it. Three felt hats and also a baseball cap were found in the car. Three pairs of rubber gloves and one additional glove were found in the car. A glove matching the additional glove was found a short distance away. These articles were not left in the automobile by the owner or rightful user.

[2] "When I saw [in] the morning paper . . . [that] there was a bank robbery . . . I asked . . . [him] if that's what he was so upset about. And he said 'Yes.' " "Did you pull the trigger that shot Mr. Lombardi?" "No. Red did." "He said he had some money that was in a coat pocket that he had left behind when he was running away. . . . [T]here might be a couple of thousand dollars . . . in packs. . . . [H]e had gotten the clothes when he broke into a doctor's house; . . . he had on the jacket . . . he had lost a shoe. He got the shoes at this doctor's house. . . . [W]hen he was running away . . . he was shot at. . . . [H]e said he already took care of it [his leg] at the doctor's house." He said, "I was in on the job." After hearing a radio report "[h]e said . . . 'I'm clean so far. They're only looking for three men. There was only three men.' And Red was the only one that could tie him in to it. We heard a description, and he laughed and he said 'That doesn't fit me.' " Q. [on cross-examination] "He did tell you that three people held up that bank, didn't he?" A. "There were three others besides himself." To two men who called on him in Mrs. Hebert's house he said, "I couldn't help it. . . . It's not my fault. . . . We couldn't wait for you. . . . [H]e said one of . . . [the two men] was supposed to have gone with them on the bank job, but one of them was late . . . so they took this other fellow . . . [who] wasn't supposed to be with them." The police had found a jacket but had observed it being worn by one of the group of three captured by them. The police had found a pair of men's shoes. The jacket left by the defendant at Mrs. Hebert's house matched a pair of trousers which Dr. Burrow turned over to the police.

ant left at Mrs. Hebert's home the jacket and trousers he had been wearing, and in exchange was outfitted in clothing of her husband.

Dr. Burrow testified that at some time during a four day period, which included the day of the robbery, his house had been broken into and that a jacket (the one left by the defendant at Mrs. Hebert's house) and a round bottle of liquor labeled "J. W. Dant" had been taken. He had a collection of perhaps forty straw hats, souvenirs, mostly from the Caribbean. He could not tell whether the collection was intact.

The defendant's testimony, if believed, would have established his alibi. He testified that on the day of the robbery he had worked until noontime in Marlboro and had spent the afternoon and evening in Worcester, drinking in various bars; that during the evening he met Mrs. Hebert's son, Richard, and obtained from him the hat he was wearing and the liquor he had in his possession at the time he was first observed by police officers; and that he stayed that night at the home of Mrs. Hebert. The defendant admitted that at some time prior to the holdup he had purchased the gun later identified as the weapon from which the fatal shot was fired. He testified that he had lent it to another man. When he learned of the robbery on the following day, while at the home of Mrs. Hebert, he concluded that the man to whom he had lent the gun had participated in the crime. Fearing that he would be involved because of the gun, he decided to flee the jurisdiction.

About one month later, the defendant was taken into custody in Kansas City and returned to Worcester for trial.

1. *The examination of prospective jurors.*

General Laws c. 234, § 28, provides: "Upon motion of either party, the court shall, or the parties or their attorneys may under the direction of the court, examine on oath a person who is called as a juror therein, to learn whether he is related to either party or has any interest in the case, or has expressed or formed an opinion, or is sensible of any bias or prejudice, therein; and the objecting party may in-

troduce other competent evidence in support of the objection. If the court finds that the juror does not stand indifferent in the case, another shall be called in his stead." The judge in his questions, of course, recognized that being related to the murder victim would be as significant as being related to a party.

General Laws c. 278, § 3, provides: "A person whose opinions are such as to preclude him from finding a defendant guilty of a crime punishable with death shall not serve as a juror on the trial of an indictment for such crime."

The rule has been often restated. The questioning of jurors, other than as required by G. L. c. 234, § 28, and c. 278, § 3, rests wholly in the discretion of the judge. *Commonwealth* v. *Kiernan*, 348 Mass. 29, 35, cert. den. sub nom. *Gordon* v. *Massachusetts*, 380 U. S. 913. *Commonwealth* v. *Geagan*, 339 Mass. 487, 504, cert. den. sub nom. *Geagan* v. *Massachusetts*, 361 U. S. 895. Even if something appears, such as pre-trial publicity, which makes it proper to go further, "[t]he determination of . . . [the] matter . . . [is] still in the discretion of the trial judge." *Geagan* case, p. 504. We discern no abuse of discretion.

(a) When examined, juror No. 71 answered that he was related to the deceased. The judge excused this juror. Counsel for the defendant asked that the record show that for four days the juror had been sequestered with the other prospective jurors. He excepted to the denial of his motion to discharge the entire venire and to the refusal of the judge to ask other prospective jurors whether they had discussed the circumstances of the case with any relative of the deceased.

There was no such risk of prejudice as to require other action than excusing juror No. 71. Of course the excused juror may have expressed some view of the case to the other veniremen, so may others in the venire, and so may acquaintances of some of them. Exposure to such comment is not a ground of disqualification. The dominant consideration, as the statutory subjects of inquiry show, is

not the views to which the jurors have been exposed; it is what is their commitment, if any, in their own opinions, or their own expressions. That juror No. 71 was a .relative did not make it significantly more likely that other jurors would have heard vehement remarks about the case of ineradicable emotional effect.

(b) Juror No. 72, when asked as to any opinion, answered, "I have an opinion, but I'm afraid it isn't a very well-founded one." He answered negatively the question whether the opinion was of such a nature as to interfere with his rendering an impartial verdict on evidence presented in court. He answered in the affirmative the question whether he had "discussed this case during the past week with anyone or read about it in the newspapers." To the next question: "Would anything that you might have read or heard about this case preclude you from finding a true verdict on the sworn evidence introduced at the trial?" he answered, "No sir."

The judge denied the defendant's requests to inquire of juror No. 72 "what that opinion is," what he had discussed or had read about the case, and, as to each such subject, "the extent to which it might affect his responsibility as a juror."

It was not an abuse of discretion to decline to extend the inquiry. The case, it is apparent, was such as to receive newspaper notice and be discussed by citizens. A number of jurors answered that they had opinions that would affect them as jurors. That juror No. 72 had discussed or read something about the case was not unusual or prejudicial if it did not affect his judgment or his impartiality. Whether to accept, without more, the declaration of a juror as to his disinterest and freedom from emotional or intellectual commitment was for the trial judge. The rather precise answer of this juror suggests that he had both the mind and temperament to exclude irrelevancies.

Persons who read little if at all and talk with no one about matters of general interest, and hence have no ideas about what happens in their environment and little practice in forming judgments about such matters, may not be

ideally suited to weigh evidence, exclude matters not properly before them, and follow the instructions of the judge. In the absence of some extraordinary circumstance (compare *Commonwealth* v. *Crehan,* 345 Mass. 609), exploration of the extent to which otherwise qualified jurors have had an awareness of the case about to be tried would not tend to make more likely the selection of an impartial competent jury.

We note that the defendant challenged juror No. 72, and has not argued that he was prejudiced in having to use a peremptory challenge to exclude him. In any event, we hold that the judge's ruling was within his discretion.

(c) Mary Szynal, juror No. 130, at first answered that she had no opinion that would preclude her from finding a defendant guilty of an offence punishable by death. Examined further, at the request of a defendant, she said that she believed that guilty defendants should be punished but not by death. She did not "believe in the electric chair." The judge then excused her. The defendant excepted. Even apart from the circumstance that no assignment of error specifies this exception we see no basis for it.

(d) After the jury had been selected, the defendant again moved to discharge the entire panel for the reasons: (1) the jury was so empanelled as not to be a jury of the defendant's peers under the Fourth Amendment to the Constitution of the United States; (2) the court had failed to make sufficient inquiry of prospective jurors to determine their indifference; and (3) the court had improperly excluded certain jurors. The defendant referred to a number of written questions which the judge earlier had declined to put to prospective jurors or to all of them. Most of the issues presented by the motion we have already discussed. We turn to the questions so far as not already dealt with.

It would have been inappropriate to inquire whether a juror had become aware of the manner in which three codefendants had pleaded guilty or had heard the remarks of counsel for one of them concerning the jurors of Worcester County. See point 2 below.

Certain of the questions, referred to by the defendant in argument, do not appear in the record, being in a motion not printed. Although nothing is before us as to them, we note that no abuse of discretion would be shown. The judge did ask certain jurors if they had any opinion that would prevent them from recommending that the death penalty not be imposed upon one found guilty of first degree murder. It was, however, not an essential inquiry. The extreme unlikelihood that any juror would answer other than that his decision would depend on the circumstances left the subject well within the judge's discretion. Having an account in or doing business with the bank that had been robbed would not be a basis for disqualification. All good citizens are against robbery; many have bank accounts. Such circumstances are not calculated to prejudice the determination whether a particular person charged committed a particular robbery.

2. *The motion for a mistrial.*

After the jury was empanelled, in their absence, the court accepted pleas of guilty from three codefendants. Thereupon a police officer summarized the Commonwealth's case, testifying, inter alia, that he had been informed that four men had entered the bank.

In the course of the empanelling, during which a number of prospective jurors had been excused because of their formed opinions, counsel for one defendant said, in pressing for a change of venue, "I want the record to show that the Court has bent over backwards being fair, and so has the District Attorney's office, but we will not get a fair trial . . . in Worcester County now, two years from now or ten years from now as regards these defendants or at least the [d]efendant I represent." Counsel for the present defendant objected to these remarks and said that he would like to state "out of fairness to Mr. Subilosky . . . that we expect to get a fair trial here in Worcester County. . . . Unless I see something to the contrary, I have every expectation of whatever jury we ultimately are going to impanel here is going to treat Mr. Subilosky fairly."

There was no error in denying the motion for a mistrial based on the foregoing events. Accepting pleas of guilty from codefendants either in the presence or in the absence of the jury is not deemed prejudicial. *Commonwealth* v. *Giacomazza,* 311 Mass. 456, 466. *Commonwealth* v. *Sousa,* 350 Mass. 591, 595–596. The court adequately instructed the jury in respect of the matter. The remarks of counsel, even if they had come to the attention of jurors, were not of a nature to prejudice them. Knowledge of counsel's belief that there would be a residue of prejudice in every juror's mind would not of itself tend to create or strengthen prejudice. If of any effect, it would most reasonably tend to cause jurors to guard against the effect of prejudice.

3. *The exclusion of questions on cross-examination.*

(a) Judith Dillon, the teller, testified on cross-examination that she talked with others of the witnesses who were there at the bank as to whether three or four men came into the bank; that she talked with Officer Metcalf about the same subject and that she talked about it the evening of the robbery with Joseph Prachniak, Jr., another teller. The court sustained an objection to the further questions (1) whether since that evening she had talked with Prachniak about whether there were three or four men there and (2) who else in the bank did she talk with about whether three or four men had been observed. The offer of proof was that she talked about the number of men with all those, other than the robbers, who were in the bank at the time. The judge, in sustaining the objection, ruled that "it is immaterial what other people told her, any evidence that she said at any time that three people entered this bank, . . . is admissible, but what somebody else told her in their opinion . . . [is] hearsay and . . . inadmissible."

There is nothing in the exceptions to these exclusions. The defendant had already shown that Mrs. Dillon had talked with Prachniak and others who saw the robbers. The judge's ruling was anticipatory of certain questions that might follow, implicit in those asked, but it showed counsel that he might examine Mrs. Dillon or others to show

that she had made prior inconsistent statements. Implicitly it indicated also that prior statements by her of uncertainty as to the number of robbers would be relevant.

(b) Prachniak on direct examination testified as to the dress of the four persons who got out of the car: "There was two of them that had" . . . Q. "You may step back on the stand." A. "They had hats on and two of them had stockings over their faces." On cross-examination he testified that the first man he saw did not wear a hat. Q. "Didn't you testify this morning . . . that all of the men had hats?" A. "I believe so, yes." . . . Q. "And we have a change in your testimony now, don't we?" A. "Yes." The defendant's counsel asked, "Why?" and excepted to the exclusion of the question. The exclusion was not prejudicial. The whole inquiry was scarcely warranted; it is by no means clear that in his direct testimony the witness had intended to testify that more than two men wore hats. On redirect examination he testified that he then specifically recalled his earlier testimony and that two of the men "did have hats."

4. *The rulings on testimony relating to whether the defendant wore a baseball cap or wore a hat.*

There was testimony that the man who fired the fatal shot wore a hat and that two men who entered the bank did not wear hats. There was also evidence as noted (fn. 1), that a baseball cap and three felt hats had been found in the escape car shortly after the robbery. There was no testimony that any of the robbers was wearing a baseball cap.

(a) Mrs. Hebert, inter alia (see fn. 2, *supra*), testified that she had known the defendant for four years, that when she came home from work at 2 or 2:30 A.M. on August 28, 1965, the defendant was there; he had scratches on him and was very upset. "The only remark I made on his clothes was the particular hat he was wearing. I had never seen him except with one style, and he had on . . . one of those golfer's or Swiss Alps hats . . . straw with a bright feather in it. . . . I just said, 'Where did you pick that hat up? . . . It's a little big for you, isn't it?'" He answered,

"I picked it up on my way here." In answer to the ensuing question, "[W]hat kind of a head gear had you usually seen him wearing?" the witness answered, over objection and subject to exception, "A baseball hat."

There was no error. The defendant specifies only that the number of times the witness had seen the defendant was not shown. That went to the weight but not to the admissibility of the testimony. If Mrs. Hebert was accepted as a credible witness, her other testimony (fn. 2) tended to make the baseball hat of minor significance.

(b) The questions to the defendant, "Did you wear a baseball hat?" and "Do you wear a baseball hat at any time?" were, we assume, excluded because they were leading. To the second question the defendant had started his answer: "No. Yeah, I did on . . .." A short answer to the exception is that there is no offer of proof. In view of the defendant's abortive answer we may not assume that he would have testified that he never wore a baseball hat. This exclusion, in any event, though narrowly based, was not in excess of the trial judge's discretion. Undoubtedly the judge would have permitted questions as to the kind or kinds of hat or hats, if any, the defendant owned and wore and when he wore each kind. Also we assume the defendant would have been allowed to testify as to what he had worn on his head at times when Mrs. Hebert had seen him, and the circumstances. We note that another witness, with whom the defendant had worked, was permitted to answer the question, "Did you see him wearing any kind of head apparel?" The answer was, "Well, when it was hot, he had his handkerchief and he put it in water and put it over his head. That's all."

Although there was no abuse of discretion, we think that such questions as the two asked would not be significantly prejudicial to the Commonwealth's case. Without amplification, such a general denial would not be impressive testimony. Narrow exclusions of supposedly leading questions unnecessarily delay and interrupt the course of the trial.

(c) Rudolph Erlandson testified that the defendant

worked with him as a carpenter's helper in Bolton in August, 1965, and that he never saw him wear a hat. The judge sustained the Commonwealth's objection to the further inquiry, "Did you ever see him wear a baseball cap?" Discretion was not abused. The defendant, if he thought that the word "hat" was too narrow, could have followed up the previous admitted question by asking if the witness had seen Subilosky wear any kind of head covering. In any case, evidence that the defendant did not wear a baseball cap when carpentering would have little relevance to whether he sometimes wore one, or whether the cap in the car was his.

(d) The exclusion of questions to Arthur Lambert, with whom the defendant worked for about ten days in August, 1965, whether he "ever . . . [saw] him wearing a hat?" or "a baseball cap?" was rendered immaterial by his answer to another question that he never saw the defendant wearing any kind of head apparel. See par. (b), *supra.*

(e) Edward Shaver testified that he was the foreman on the construction job on which the defendant worked in August, 1965. The defendant excepted to the exclusion of the question, "Did you ever see the defendant wearing a hat?" There was no abuse of discretion. We assume that the judge thought the question leading. We assume also that the answer would have been in the negative. Further evidence to show that the defendant did not wear a hat when carpentering would have had slight relevance to whether he wore a hat at the time of the robbery.

5. *The defendant's motion for a directed verdict on the indictment charging conspiracy.*

The assignment of error based on the denial of the defendant's motion for a directed verdict on the conspiracy indictment brings nothing before us. The indictment was placed on file with the consent of the defendant. An appeal lies only from the judgment, that is, the sentence. *Commonwealth* v. *Locke,* 338 Mass. 682, 684.

6. *The denial of the defendant's motion for a directed verdict on indictment No. 24,370 charging larceny from the person of Pasquale J. Lombardi.*

The defendant contends that, because testimony shows that the cash was taken from the cash drawers for which the tellers Judith Dillon and Joseph Prachniak were responsible, a verdict of "not guilty" should have been directed on the indictment charging larceny from the person of Lombardi, the murder victim. Lombardi, also a teller, was acting manager of the bank on the day of the robbery, and was in the banking room when the robbers entered. There was no error.

The funds in the bank were under Lombardi's protection; hence the essential elements of the crime of larceny from the person have been shown. See *Commonwealth* v. *Weiner*, 255 Mass. 506, 509; *Commonwealth* v. *Homer*, 235 Mass. 526, 533. "[I]t is sufficient if the property be taken from the presence of the victim . . . [that is] within his area of control." Anderson, Wharton's Criminal Law & Procedure, § 553.

7. *Sufficiency of the evidence to support the defendant's conviction of larceny of an automobile.*

The trial judge did not err in denying the motion for a directed verdict on indictment No. 24,378, charging larceny of an automobile. Although very little of the evidence offered by the Commonwealth was directed specifically to this indictment, the evidence was sufficient to take the issue to the jury.

Neither the defendant nor any of the three others involved in the robbery had the owner's permission to use the automobile. There was evidence on which the jury could find that all four of the participants in the robbery were in possession of it. The defendant's possession of the car was evidence that he was guilty of taking it. *Commonwealth* v. *Grace*, 265 Mass. 119, 124. *Commonwealth* v. *Ross*, 339 Mass. 428, 431–432. Whether the taking is to be regarded as larcenous is for the jury to decide on all the facts. *Commonwealth* v. *Cabot*, 241 Mass. 131, 142–143. The issue for the jury was whether the defendant intended permanently to deprive the owner of the automobile. We assume that an instruction would have been warranted that the jury might find that the defendant was guilty only of

the lesser offence of unauthorized use of a motor vehicle. But such an instruction was not requested and the defendant has not argued that there was error in its omission. See *Commonwealth* v. *Enwright,* 259 Mass. 152, 158; *Commonwealth* v. *Smith,* 342 Mass. 180, 188; *Commonwealth* v. *Holiday,* 349 Mass. 126, 128; Rule 13 of the Rules for the Regulation of Practice before the Full Court, 345 Mass. 787.

8. *The exclusion of testimony from the defendant, explaining why he had purchased a gun.*

The defendant assigns as error the judge's exclusion of his counsel's question, "Why had you purchased that gun?" There was no offer of proof. We assume that evidence would be admissible to explain more fully, why, with no criminal intent of the defendant, a gun which the defendant had purchased had been, as he said, loaned to another. Wigmore, Evidence (3d ed.) § 239. See 1 Wharton's, Criminal Evidence (12th ed.) §§ 193, 211. *Commonwealth* v. *Bowers,* 121 Mass. 45. *Commonwealth* v. *Blair,* 123 Mass. 242. We assume also, as a step in such an exculpatory showing, that testimony of an innocent intent in the purchase would, on proper questions, be admissible, even though somewhat remote from the main issue. But we do not know what the defendant would have said. Further, the exclusion of a general "why" question did not bar more precise inquiry tending to show a noncriminal intent.

9. *The admission of records showing the defendant's earlier criminal convictions.*

Evidence of the defendant's prior criminal convictions properly was admitted pursuant to G. L. c. 233, § 21. The judge correctly instructed the jury that this evidence was to be considered only with respect to his credibility. Earlier in his testimony, the defendant had admitted that he had been "in a great deal of difficulty with the police" and had spent "a substantial amount of time in State Prison." Such reference to his prior criminal convictions does not make the admission in evidence of the records themselves unnecessary, cumulative, or error.

10. *A closing argument by the prosecutor in respect of the defendant's alibi.*

Commonwealth v. Subilosky.

In cross-examination the defendant had been asked whether he had told two police officers he had a perfect alibi, that is, that on the day of the robbery he had burned a barn in Bolton for the contractor he worked for and did not leave the fire until 6 P.M. He had answered that he did not recall making the statement. The defendant's counsel had argued in his closing: "Where are the police officers that he is supposed to have said that to? He never said it. That's why no police officers took this witness stand. . . . You have a right to infer that he didn't say it, because . . . [the prosecutor] didn't bring in any police officer to say that he did say it."

The reason for not believing that the defendant had said what the questions suggested was not the failure of the prosecutor to bring in the police officers; it was the absence of any evidence that the defendant had made the statement. But the defendant's argument suggested that the prosecutor could not prove that the defendant had made the statement and that his case was thereby weakened. It was not prejudicial in these circumstances for the prosecutor to read the testimony and then say: "Now, my brother knows as well as I do that unless somebody says something, that you can't bring somebody else in to contradict it if he doesn't recall it." What the defendant may have said about a perfect alibi was not an admission; the testimony referred to was not admissible otherwise than in contradiction and there was nothing to contradict. We discern nothing improper in the prosecutor's argument.

Furthermore, the trial judge properly instructed the jury: "The evidence in this case is the testimony that came from the lips of the witnesses on the stand, what you observed on the view, and the exhibits that were offered in evidence . . . . Statements of counsel in their opening and in their arguments on the evidence after the case was completed . . . are not testimony and you should completely disregard any statement of fact made in the argument unless you find it to be true on the real evidence in the case."

11. No other assignment of error is argued.

*Judgments affirmed.*