COMMONWEALTH *vs.* ALBERT H. DeSALVO.

Middlesex.   November 6, 1967. — January 4, 1968.

Present: WILKINS, C.J., WHITTEMORE, CUTTER, SPIEGEL, & REARDON, JJ.

*Insanity. Evidence,* Competency; Opinion: expert; Of insanity.

In a criminal case in which the defence was insanity and the trial was held before the decision of this court in *Commonwealth* v. *McHoul*, 352 Mass. 544, there was no error in a charge stating the test of criminal responsibility in the words of *Commonwealth* v. *Rogers*, 7 Met. 500, qualified by the language of the American Law Institute's Model Penal Code, Proposed Official Draft (1962) § 4.01. [478]

Where a witness for the defendant in a criminal case testified on the issue of the defendant's sanity that he did not meet the test of *Commonwealth* v. *Rogers*, 7 Met. 500, because he lacked substantial capacity

to appreciate and to control his conduct, there was no harmful error in excluding a question to him, later allowed as to other witnesses, phrased in the express terms of the American Law Institute's Model Penal Code, Proposed Official Draft (1962) § 4.01. [479]

At the trial of indictments for acts involving certain women victims, where the defence was insanity, there was on the record no error in exclusion of evidence of statements made by the defendant in an interview with an assistant attorney general as to crimes, unrelated to those on trial, committed by the defendant by sexual attacks upon and murders of women, or in exclusion of evidence as to verification by a police officer of certain facts stated by the defendant. [479–480]

On the record of a criminal case in which the defence was insanity, there was no prejudicial error in exclusion of certain questions to a psychiatrist, an expert witness for the Commonwealth, bearing on other, unrelated crimes claimed by the defendant to have been committed by him, of which the witness testified he had heard but not "in the form of a history" [480–481]; nor was there error in exclusion of a question by the defendant to his own expert psychiatrist witness as to what he had heard about certain aspects of the other crimes, where the offer of proof was not confined to information coming to him as history evaluated by him in forming his opinion with respect to the defendant. [482]

In a criminal case in which the defence was insanity, the evidence, including conflicting expert testimony, presented an issue for the jury as to whether or not the defendant had substantial capacity to control his conduct, and there was no merit in a contention by him that this court should rule that a verdict of guilty could not stand in that it was plainly shown that he lacked such capacity. [482]

Where, in a criminal case, the defence was insanity and there was conflicting expert testimony as to whether the defendant had substantial capacity to control his conduct, the fact that the experts who testified that he had such capacity also agreed that he was mentally ill and dangerous did not provide basis for a ruling as matter of law that he lacked such capacity. [482–483]

EIGHT INDICTMENTS found and returned in the Superior Court on January 8, January 12, February 4, and February 8, 1965.

The cases were tried before *Moynihan,* J., in January, 1967.

*F. Lee Bailey* for the defendant.

*Donald L. Conn,* Assistant Attorney General (*Ruth I. Abrams,* Assistant District Attorney, with him), for the Commonwealth.

WHITTEMORE, J. The defendant was tried and convicted in the Superior Court upon eight indictments charging assault and battery by means of a dangerous weapon, commis-

sion of unnatural acts, breaking and entering, larceny, and armed robbery. Among other witnesses four adult women, victims of the defendant's conduct, testified. His defence was insanity. Two experts testified for the defence; three for the Commonwealth. The defendant did not testify. The history taken by all the experts showed the defendant to be subject to abnormal, very intense, and frequently recurring sexual urges. The experts agreed that he was mentally ill and dangerous but differed as to whether he acted under impulses which he could not control. General Laws c. 278, §§ 33A to 33E, were made applicable to the trial and the defendant has appealed.

The charge so stated the test of criminal responsibility formulated in the Model Penal Code (Am. Law Inst. Proposed Official Draft [1962] p. 66, § 4.01) along with the words of the classic *Rogers* test (*Commonwealth* v. *Rogers*, 7 Met. 500, 501–502), as to make manifest to the jury, what we later held in *Commonwealth* v. *McHoul*, 352 Mass. 544, 551–553, 555, that the Code test is "an evolutionary restatement of our rule rather than a substantively new rule." The judge instructed that the defendant, to be held responsible under the stated cognitive test (knowing right from wrong) "must have substantial capacity to appreciate the wrongfulness of his act," and to be held responsible under the stated test of irresistible impulse he "must have substantial capacity to control his conduct so as to be able to abstain from doing the unlawful act."

The defendant contends that even though, as we have indicated, the adoption of the Code test does not mean that it was error to conduct a prior trial under the *Rogers* case language, nevertheless it was prejudicially confusing to refer to both tests. There is nothing in this. It was plainly helpful to the defendant's case to qualify the *Rogers* case test in what the defendant describes as "the more workable and desirable language" of the Code.[1]

---

[1] The examination and cross-examination reflected concepts that arose under the *Rogers* case formulation but this did not prejudice the defendant. For example, to the extent that Commonwealth experts based their conclusions on the view that the defendant would not have acted as he did with a

The defendant's first witness, although testifying before the judge had ruled that the language of the Code test might be used in the examination of experts, in effect testified that the defendant did not meet the *Rogers* test because he lacked substantial capacity to appreciate and to control his conduct. There was therefore no harmful error in excluding a question to him in the express terms of the Code, even though the question was allowed as to later witnesses.

The defendant excepted to the exclusion of certain testimony offered for the purpose of showing that he had committed sexual attacks on and had murdered a number of women in the period from June, 1962, to January, 1964. The judge had permitted each expert to testify to the history of the defendant as it was derived from his interviews with the defendant and certain records. Thus the jury heard from the defendant's two experts their account of his statements about those crimes but under appropriate instructions that this was not proof that the defendant had committed them. *Commonwealth* v. *Belenski*, 276 Mass. 35, 47. There was also reference to the crimes in the testimony of Dr. Samuel Tartakoff, one of the Commonwealth's experts. He testified that he had heard from the defendant his account of the "macabre" events of "most serious consequence" in the period from June, 1962, to January, 1964. He accepted the account as historical information. His opinion was that the defendant "was in fact telling me the truth as he understood it. And he was not deluding."

The defendant excepted to the refusal of the trial judge to allow a former assistant attorney general to testify to his interviews with the defendant. The offer of proof was that the interviews were in the presence of the defendant's guardian and were for the purpose of advising certain psychiatrists assigned by the Commonwealth whether the defendant was subject to delusions or was feigning or was telling the truth as to the murders. The other part of the

"policeman at his elbow," they opened for the defendant the argument that this did not show *substantial* capacity to conform to the requirements of law, the defendant's conduct taking place in the absence of legal restraint or of confinement.

defendant's proposed demonstration was shown in the offer
to have a Boston police officer testify to instructions from
the assistant attorney general and his resulting verification
of the truth of certain physical facts stated by the defendant
in the interviews.

This was plainly inadmissible evidence. It had no stand-
ing as "history" appraised by an expert and underlying his
opinion. A party cannot put in incompetent evidence to
fortify his experts' opinions. *Commonwealth* v. *Sinclair*,
195 Mass. 100, 108. *Peirson* v. *Boston Elev. Ry.* 191 Mass.
223, 233–234. Conduct of the defendant tending to show
his inability to control himself was a fact to be proved in
usual ways. Although it is beside the evidential point, the
judge may have differed with the view that the testimony
would have helped the defendant. The risk of prejudice
to the defendant in the references to the murders (*Com-
monwealth* v. *Welcome*, 348 Mass. 68, 70–71, *Commonwealth*
v. *Nassar*, 351 Mass. 37, 44–45) justified careful rulings
in accordance with well established principles.

The defendant excepted to the exclusion of a line of in-
quiry to Dr. Samuel Allen, another of the Commonwealth's
experts, and Medical Director at Bridgewater State Hos-
pital. Dr. Allen had testified that he had heard mentioned
in several places by several people the events in the period
from June, 1962, to January, 1964, but did not receive a
history of them "in the form of a history." The question,
the exclusion of which cut off other questions, was whether
an official went to Bridgewater to determine if the defendant's
story was factual. The offer of proof was that the defendant
through his attorneys and guardian had assented to a pro-
longed interrogation by an assistant attorney general taken
by agreement between the Commonwealth and the de-
fendant as to the reliability of the defendant's account, and
that Dr. Allen was one of the psychiatrists for whose bene-
fit this history was taken.

There was no error. The issue is not presented whether
in the course of his study to form an expert opinion a physi-
cian must in all circumstances get the entire history by his

own inquiries and confine himself to talks with the defendant.[2] Dr. Allen could not properly be cross-examined about conduct of the defendant not in evidence and not appraised by him as a part of his study and evaluation of the defendant. *Commonwealth* v. *Harrison,* 342 Mass. 279, 287–288, and cases cited. His testimony that what he heard did not come to him as "a history" was, in effect, testimony that this information had not been included in his underlying data.

Further, the defendant shows no prejudice. The transcript persuasively suggests that he had all possible advantage from the circumstance that Dr. Allen had some information in respect of the defendant's assertions as to the other crimes. The physician's further testimony was that he "certainly would" consider that a history of homicidal conduct would be significant diagnostically in arriving at an opinion as to the defendant's ability to resist impulsive acts; that if it appeared that the conduct was sexually "motivated or accelerated" he would consider that significant; and his opinion that the defendant had not acted under irresistible impulse in the crimes being tried had been arrived at "practically without" such a history. In his opinion the defendant is insane, and is suffering from mental illness, de-

---

[2] See *Commonwealth* v. *McGruder,* 348 Mass. 712, 714–715 (Legislature in authorizing "radical departure" from existing rules of evidence so that psychiatrists could use records containing history of prior examinations and "such other information as may be helpful to assist . . . [the] diagnosis," could have concluded that "to require the examining psychiatrists to base their opinions on matters within their personal knowledge or on evidence admissible under conventional rules would be unduly restrictive. . . . [and also] that since most of the information . . . [would be in] court and probation records, it would be sufficiently trustworthy.") See Morgan, Basic Problems of Evidence, 332 ("If such data furnished by the patient are properly usable, so should be the findings of other physicians, symptoms observed and reported by nurses and even by reliable non-professional attendants, such as the wife or mother of the patient. . . . In view of the great abuse of expert medical testimony . . . it must be conceded that there is some justification for making haste slowly, but it is suggested that the proper remedy lies elsewhere than in the exclusionary rules of evidence"); McCormick on Evidence, § 15; Dieden and Gasparich, Psychiatric Evidence and Full Disclosure in the Criminal Trial, 52 Cal. L. Rev. 543. See also *Welter* v. *Bowman Dairy Co.* 318 Ill. App. 305, 364; *Yellow Cab Co.* v. *Henderson,* 183 Md. 546, 553–554; *Vinicky* v. *Midland Mut. Cas. Ins. Co.* 35 Wis. 2d 246, 253–257.

fined as mild schizophrenia, but sufficiently severe so that he is committable because he is sick and dangerous.

The defendant excepted to the exclusion of a question to his own expert, Dr. Robert R. Mezer, seeking his testimony that he had information that the victims in almost all the homicides had been left in singular, bizarre and obscene positions, that the bodies of some of them had been subjected to shocking indignities and that this was schizophrenic conduct. The physician had already testified that bizarre conduct was significant in diagnosing schizophrenia. The offer of proof was not confined to information which had come to the physician as history evaluated by him in forming an expert opinion as to the defendant. The implication was that the doctor was being asked to give an expert opinion on the significance of what he had heard that the police had found.[3] Such testimony of the witness was not admissible on any ground.

The defendant finally contends that the evidence so plainly shows that he was without substantial control that we should rule that the verdict cannot stand. We may not do this. Experts having differed, as was to be expected in a borderline case (*Commonwealth* v. *McHoul*, 352 Mass. 544; *Jarvinen* v. *Commonwealth, ante,* 339, 340), there was a jury issue. Although significant testimony of the Commonwealth's experts was helpful to the defendant it does not conclusively establish lack of capacity.[4] See *Commonwealth* v. *Cox,* 327 Mass. 609, 614–615.

It is not a basis for a legal ruling that the defendant is without substantial capacity to control his conduct that

---

[3] "[T]he doctor would recite the following examples . . . . In almost all of the homicides, the victims were left in a single [singular?] and ludicrous position . . . . In one . . . [an object] *was found* . . . [as described] and in another . . . [an object] *was found* . . . [as described]" (emphasis supplied).

[4] One of the Commonwealth's experts testified that he had earlier been of the view that the defendant was not responsible under the Code test. There was expert testimony that the line between psychosis and sociopathic behavior was uncertain. One expert who gave great weight to the "policeman at the elbow" test recognized that the defendant had "some abnormal compulsion that drives him to the abnormal sexual gratification" and although in a controlled situation he is quiescent, when not in a controlled situation he sometimes becomes extremely violent, so "there is a compulsion of some sort."

those experts who testify that he has such capacity also testify that he is mentally sick or that a cure is doubtful or that he should be committed because he is dangerous. The Code test does not apply the *Durham* rule. *Durham* v. *United States*, 214 F. 2d 862 (Ct. App. D. C.). See *Commonwealth* v. *Chester*, 337 Mass. 702, 712–713. Notwithstanding such evidence the Code test in the use of the word "substantial" leaves the issue squarely in the hands of the jury.[5] The issues tried in such a case as this do not include whether the defendant should have treatment, or whether, apart from guilt, he should be segregated. See G. L. c. 123A.

Criminal acts having been committed, and the evidence not being conclusive, a determination was required whether the perpetrator was responsible or irresponsible under the law. No better way appears to determine that than by leaving to the twelve citizens of the jury the application of a reasonable and understandable rule after a fair trial and under fair and full instructions. That is what happened in this case.

*Judgments affirmed.*

---

[5] In many if not most cases the expert description of a disease and its effect on the defendant's conduct will be more significant than the concluding views of the expert as to criminal responsibility under the carefully formulated legal test. The testimony in this case showed that overall impressions and feelings have a part in expert conclusions. Although experts must weigh all factors much as the jury must do, their testimony must not in effect usurp the jury's functions. See *Washington* v. *United States*, 390 F. 2d 444, 451–456 (Ct. App. D. C.).