COMMONWEALTH *vs.* DELPHA D. RICARD.

Bristol.   February 4, 1969. — April 3, 1969.

Present: WILKINS, C.J., SPALDING, WHITTEMORE, KIRK, & REARDON, JJ.

*Jury and Jurors.   Practice, Criminal,* Examination of jurors. *Constitutional Law,* Due process of law. *Insanity.   Evidence,* Of insanity; Opinion: expert.

At the trial of a murder case in which insanity was a defence, there was no abuse of discretion or denial of due process of law where the judge, who asked the prospective jurors the statutory questions and one additional question suggested by the defendant, refused to ask them, or to permit them to be asked, certain further questions requested by the defendant as to their views about psychiatrists and insanity. [510–511]

Discussion of the selection of a fair jury in a criminal case.  [511–512]

A finding that the defendant in a murder case was not criminally responsible mentally at the time of the murder was not required, and

a finding that he was so responsible was warranted, on evidence of chronic alcoholism on his part prior to the murder, of his drinking at a bar on the afternoon and evening of the murder, of an altercation and fight there in the evening between him and the victim, of the defendant's then procuring a gun and, about an hour after the fight, shooting the victim as he left the bar, and of the defendant's conduct after the murder, although expert testimony that he was not so responsible was uncontradicted. [513–515]

INDICTMENT found and returned on June 9, 1966.

The case was tried in the Superior Court before *Beaudreau,* J.

*Ronald D. Harper* for the defendant.

*Joseph P. Harrington,* Assistant District Attorney, for the Commonwealth.

WHITTEMORE, J. Ricard was indicted for and found guilty of the murder of Charles C. King in New Bedford on May 14, 1966. The jury recommended that the death penalty not be imposed. On appeal under G. L. c. 278, §§ 33A–33G, Ricard contends that it was error for the judge (1) not to put questions to prospective jurors as to their views about psychiatrists and insanity or to permit their examination on a voir dire; and (2) not to direct a verdict for him on the grounds that the only expert testimony showed him to be criminally insane and the Commonwealth had not proved him sane. His appeal from the denial of a motion for a new trial is founded on the insanity point.

1. Our rule, repeatedly reaffirmed, is that the decisions whether to allow questions other than those required by G. L. c. 234, § 28,[1] and c. 278, § 3,[2] and whether to allow

---

[1] "Upon motion of either party, the court shall, or the parties or their attorneys may under the direction of the court, examine on oath a person who is called as a juror therein, to learn whether he is related to either party or has any interest in the case, or has expressed or formed an opinion, or is sensible of any bias or prejudice, therein; and the objecting party may introduce other competent evidence in support of the objection. If the court finds that the juror does not stand indifferent in the case, another shall be called in his stead."

[2] "A person whose opinions are such as to preclude him from finding a defendant guilty of a crime punishable with death shall not serve as a juror on the trial of an indictment for such crime." The judge also asked the jurors an additional question suggested by Ricard: "If after hearing the evidence and the law as given you by the court, you find the defendant guilty of an offense punishable by death could you recommend a sentence less than the death penalty?"

questions by counsel are within the discretion of the trial judge. *Commonwealth* v. *Taylor,* 327 Mass. 641, 646–647. *Commonwealth* v. *Bonomi,* 335 Mass. 327, 333–335. *Commonwealth* v. *Geagan,* 339 Mass. 487, 504, and cases cited, cert. den. 361 U. S. 895. *Commonwealth* v. *Kiernan,* 348 Mass. 29, 35–36, cert. den. 380 U. S. 913. *Commonwealth* v. *Nassar,* 351 Mass. 37, 40–41. *Commonwealth* v. *Subilosky,* 352 Mass. 153, 158.

Some of these cases recognize that there may be circumstances, such as extensive pre-trial publicity, making it appropriate or "proper to go further" (*Commonwealth* v. *Poisson,* 157 Mass. 510, 512). Whether to do so remains, however, a decision for the trial judge. The judge in this case did not abuse his discretion in excluding the questions sought.[3]

It may not be assumed that there is a general prejudice against psychiatrists and a general rejection of the concept of irresponsibility because of mental illness or defect. There appears slight chance that pre-trial inquiry in respect of the defence of criminal irresponsibility would tend to assure a fairer and more competent jury to judge that issue. When the jurors confront it they will have heard for the first time what the test is (that is, not "insanity," but that "a person is not responsible for criminal conduct if at the time as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law." *Commonwealth* v. *McHoul,* 352 Mass. 544, 546–547). They will have heard the expert and other testimony. Answers to pre-trial questions as to views about insanity and about experts in mental illness would give a very

---

[3] The questions which Ricard wished to have asked were these: "Do you believe in psychiatry? Are you aware of any bias or prejudice that would prevent you from believing or accepting testimony given by a psychiatrist as to defendant's mental condition? Do you believe that a person can be insane? If you believe that the defendant is presently sane, would this prevent you, after hearing all of the evidence and the law as given you by the court, from being able to find the defendant insane at the time of the homicide? Are you aware of any bias or prejudice that would prevent you after hearing all the evidence and the law as given you by the court from finding the defendant not guilty of murder in the first degree by reason of insanity?"

uncertain indication of what the state of mind of the jurors would be after hearing the evidence and proper instructions.

To attempt a pre-trial appraisal that would be significant, the judge would have needed to explain the test to be applied; he would have been obliged in effect to give much of the substance necessary and appropriate in instructions after the evidence was in. This, as a practical matter, would have meant a lecture to the entire venire based on hypothetical facts. Even then there would be absent that understanding that comes from hearing the testimony on direct and cross-examination of the psychiatric experts.

The chance we think is most remote that in a particular jury selected under our rules there would be a prejudiced mind or prejudiced minds sufficient to determine a verdict against the defendant on the issue of lack of responsibility for criminal acts or to prevent a fair appraisal of the issue under proper instructions.

Our rule is founded in the belief that a fair trial is afforded by a jury of twelve citizens impartial as to the persons involved and unprejudiced and uncommitted as to the defendants' guilt or past misconduct. Every individual has impressions and beliefs, likes and dislikes. That those of a particular juror will not be determinative or dominant is reasonably assured by the requirement of a unanimous verdict, the awesome responsibility of the task assigned, the dignity and solemnity of the courtroom where the task is performed, and the careful instructions of the judge not only as to the law to be applied, but also and importantly as to the determination of guilt or innocence on the evidence, free of all extraneous considerations.

A fair jury is one that represents a cross section of community concepts. See *Commonwealth* v. *Subilosky,* 352 Mass. 153, 159–160; *Irvin* v. *Dowd,* 366 U. S. 717, 722–723; *Swain* v. *Alabama,* 380 U. S. 202. See also *Connors* v. *United States,* 158 U. S. 408, 412–414. Our method of selecting jurors has, we believe, worked well. It has avoided the weeks of pretrial proceedings that are common elsewhere.

We do not agree that the due process clause of the Fourteenth Amendment to the Constitution of the United States requires voir dire inquiry such as was here requested. See *Commonwealth* v. *Taylor,* 327 Mass. 641, 647; *Commonwealth* v. *Coggins,* 324 Mass. 552, 557, cert. den. 338 U. S. 881; *Snyder* v. *Massachusetts,* 291 U. S. 97, 105.

2. There was sufficient evidence to take to the jury the issue of lack of criminal responsibility. Ricard had been drinking; he had been in and out of Burt's Grill on Union Street, New Bedford, from about 2:30 P.M. on May 14, 1966. He was standing at the bar at 10 P.M. when another customer made a remark to him following which he pushed that customer against a booth. King intervened and an altercation followed that led to a fight outside the grill between King and Ricard. It ended when King, "on top" of Ricard, said, "Have you had enough?" The jury could have found that Ricard then left, got a gun, returned, waited outside the grill, and between 11 and 11:30 P.M. shot King as he left the bar. Ricard drove to Worcester at about ninety miles an hour, slept in his car in Worcester, and gave himself up at the police station the next morning, saying he had heard on the radio he had killed a man the night before. He was crying, he said he did not want to disgrace his family, and he appeared to one officer to be drunk.

Beginning on May 16, 1966, Ricard was in the Bridgewater State Hospital for two successive thirty-five day periods for observation and in July, 1966, he was certified by psychiatrists as unable to stand trial. He was committed to the hospital indefinitely at that time.

Dr. Lawrence J. Barrows, assistant medical director at the hospital, had Ricard under his care and observation from August 10, 1966, having first seen him on that day. In his opinion Ricard was psychotic for almost eight months following May 14, 1966. He found a "chronic brain syndrome" (permanent damage) due to prolonged use of alcohol, paranoid delusions and lack of insight into reality. The records available to him showed that Ricard had been admitted to the Taunton State Hospital in 1964. The history

as given by Ricard showed that he had been drinking steadily for six months before the crime; also that he had suffered from delirium tremens in the past. Dr. Barrows's opinion was that on May 14, 1966, Ricard lacked substantial capacity to appreciate the criminality of his conduct and to conform his conduct to the requirements of law. He testified that the only conclusive opinion would be that of the director, Dr. Samuel Allen, who had examined Ricard on admission and had had the care of him for the first three months of his admission. Dr. Allen was not available to testify as he had been ill and was out of the Commonwealth. Dr. Barrows testified, however, that Dr. Allen had agreed with him "that we did not feel he was criminally responsible."

The witness testified that he had no knowledge of what Ricard drank on May 14, 1966; he would "only be conjecturing" if he said he could tell exactly what Ricard was like on May 16, 1966; that it was possible he was then sane; but he believed it was not probable that he was rational or "he wouldn't have attempted to kill the man." He testified in answer to questions by the judge that it was very possible that the long period of treatment at Bridgewater was necessary because of Ricard's remorse and depression brought on by his having admitted to killing a man and that the treatment was prolonged because of chronic alcoholism.

Undoubtedly the expert testimony with the other evidence permitted a finding of criminal irresponsibility. But it was not a required conclusion; the absence of expert opinion to counter that of Dr. Barrows did not require it. In *Commonwealth* v. *Francis, ante,* 108, 111, we said, "*Commonwealth* v. *Clark,* [292 Mass. 409] at page 415, stated that in assessing a defendant's mental responsibility for crime the jury should weigh 'the fact that a great majority of men are sane, and the probability that any particular man is sane.' Yet this assessment is to be made in each case in the light of the evidence introduced." Here there was evidence of provocation that could lead a sane man to a murderous act. There had been an altercation and a fight in which Ricard was overcome.

Dr. Barrows's syllogism (Ricard was not rational as otherwise he would not have killed a man) is not persuasive. It is possible, if not probable, that Ricard's control of his conduct was affected by drink, but that was not a basis for concluding lack of responsibility for the murder because of mental disease or defect.

The probability that any particular man is sane may be of slight if any weight in the face of unanimous psychiatric opinion to the contrary, where it is plainly apparent from the evidence that the act committed is not one that a sane person would have committed, there being no circumstances (anger, revenge, rejection, jealousy, hatred, insult, intoxication, or the like) to account for the murderous act by a sane person. *Commonwealth* v. *Cox*, 327 Mass. 609, was such a case. There was here, however, evidence of provocation and evidence in Ricard's conduct before and after the murder to permit a finding that he did not lack substantial control because of mental disease or defect. The concept underlying the test of irresponsibility because of mental disease or defect is necessarily imprecise. Where the evidence permits, the jury, not the experts, are to give the answer. *Commonwealth* v. *DeSalvo*, 353 Mass. 476, 483.

*Judgment affirmed.*