COMMONWEALTH *vs.* JAMES W. KILLELEA.

Suffolk.    May 3, 1976. — July 12, 1976.

Present: HENNESSEY, C.J., BRAUCHER, KAPLAN, & WILKINS, JJ.

*Homicide. Insanity. Practice, Criminal,* Charge to jury, Argument by prosecutor, Examination of jurors. *Evidence,* Other offense, Relevancy and materiality.

There was prejudicial error in a murder trial during which the prosecutor in closing argument repeatedly implied that the defendant would go free if found not guilty by reason of insanity and the judge, in response to a request for curative instructions, merely stated that in reaching a verdict the jury should not consider what would happen to the defendant. [644-649]

At a murder trial at which the defendant proposed to raise insanity as a defense, the judge did not abuse his discretion under G. L. c. 234, § 28, as amended by St. 1973, c. 919, in refusing to ask prospective jurors questions with regard to bias toward psychiatrists or the defense of insanity. [649-650]

The judge did not abuse his discretion at a murder trial at which the defendant raised insanity as a defense in permitting the prosecutor to elicit on cross-examination of two psychiatrists called by the defendant evidence of several prior arrests of the defendant for assault and battery in order to demonstrate that the defendant had not been candid in revealing his prior history to the doctors. [650]

At a murder trial where the defendant claimed he shot the victim, who was holding part of a replica of a gun, in self-defense, the exclusion of evidence that the defendant was unfamiliar with guns was, if error, harmless in the circumstances. [650]

INDICTMENTS found and returned in the Superior Court on March 7, 1974.

The cases were tried before *Roy, J.*

After review was sought in the Appeals Court, the Supreme Judicial Court, on its own initiative, ordered direct appellate review.

*James F. Sullivan* for the defendant.

*Thomas F. Reilly,* Assistant District Attorney (*Kathleen M. Curry,* Assistant District Attorney, with him) for the Commonwealth.

HENNESSEY, C.J.   The defendant was indicted for murder in the first degree of one Kevin P. Shea and assault and battery by means of a dangerous weapon on one Mark Chinetti. He was convicted by a jury of murder in the second degree and assault and battery by means of a dangerous weapon, and was sentenced to life imprisonment on the murder indictment and to two and one-half to three years on the assault and battery indictment, the term of years to be served concurrently with the life sentence. He prosecutes this appeal pursuant to G. L. c. 278, §§ 33A-33G.

Of the many errors assigned by the defendant, only the following were briefed and argued on appeal: (1) that certain of the prosecutor's statements to the jury in closing argument were improper and that the prejudice from these comments was compounded by the instructions of the trial judge; (2) that the judge abused his discretion in denying the defendant's requests that inquiry be made of prospective jurors regarding the uncertainty or misconceptions the jurors may have had as to the result of an acquittal by reason of insanity and the possibility of bias or prejudice on the juror's part toward the testimony of psychiatrists; (3) that the verdict was against the weight of the evidence and should be set aside pursuant to this court's power under G. L. c. 278, § 33E, since the prosecution did not sustain

its burden of proving the defendant sane beyond a reasonable doubt; (4) that various rulings by the judge were erroneous; specifically, in allowing cross-examination into the prior criminal record of the defendant, in excluding evidence that the defendant was unfamiliar with guns, in allowing certain answers by the medical experts who testified in the case, and in allowing the prosecutor to impeach one of the defense experts by use of a treatise which, the defendant claims, was not properly before the jury; and (5) that the judge erred in his charge to the jury by intruding into the jury's province of determining the credibility of and weight to be given to the testimony of several witnesses.

We conclude that certain of the prosecutor's statements to the jury in closing argument were so prejudicial to the defendant as to require reversal of the judgments and the granting of a new trial.

We summarize the facts as follows. The defendant, James W. Killelea, was, at the time of the crimes involved here, employed as a court officer with the Municipal Court of the Roxbury District. Killelea had suffered a heart attack in January, 1973, and was unable to return to his duties as a court officer until the early part of May, 1973. There was detailed testimony from which the jury could infer that Killelea was worried about retaining his job; that his personality changed after the heart attack, and he became depressed, withdrawn, argumentative and leery of handling prisoners on his own. He began to take seriously certain threats made by some of the prisoners he transported, and thought that a revolution was imminent. He obtained a permit to carry a handgun, and carried a gun to work every day.

There was evidence that on December 7, 1973, the day before the homicide, Killelea talked at length with a friend (Stanton). Killelea was agitated, and spoke at length of an impending revolution. He connected various local and national leaders with the revolution. He said that the world was coming to an end. He showed Stanton his handgun and advised Stanton to procure one. Killelea left Stanton, re-

turned home, and remained awake all night with all the outside lights to his house on.

On December 8, 1973, Killelea worked at the court house in Roxbury. Before going to work Killelea ingested one or two Valium tablets and some Robitussin DM cough syrup. When he arrived in the morning he saw some soldiers, military vehicles and at least one artillery piece outside the court house. It appeared to Killelea that the artillery piece was pointed toward one of the housing projects near by, and Killelea was convinced that the revolution had begun. Killelea's fellow court officers testified to his unsettled actions on the morning of December 8, and to the fact that Killelea refused, when instructed by the senior court officer present that day, to aid another court officer in transporting two prisoners from the court house to a jail.

After work Killelea drove to South Boston and to downtown Boston to see if there were any soldiers in those parts of the city and to inquire into possible evidence of the revolution there. He then proceeded to a gasoline station in Dorchester which he had begun frequenting during his convalescence from the heart attack and which was the site of a used car venture he had been involved in with the owner of the station and a mechanic.

A few of the persons present at the gasoline station were smoking a marihuana cigarette, and Killelea himself took two "drags" on the cigarette. Killelea engaged in conversation with several persons (all known to him) at the gasoline station, and these persons testified at trial that Killelea was preoccupied with the gasoline shortage and was "rattling on" about no gasoline for the garbage trucks and garbage piling up in the streets. Killelea also spoke to Kevin Shea (the deceased), whose sister's car had done some damage to one of the used cars owned by Killelea, and asked Shea to get the name of his sister's insurance company. There was testimony that Shea responded by saying, "It's not my car. It's my sister's and has nothing to do with me."

Shea, Mark Chinetti and one David Currie were, a short time later, attempting, in the office area of the gasoline sta-

tion, to assemble a replica .45 caliber pistol. Killelea was in the office at a place behind the three boys. Though the evidence was in conflict as to whether Shea was holding any piece of the unassembled pistol, witnesses testified that Shea said, "Jimmy [Killelea], do you know how to put a .45 together?" and that Killelea responded affirmatively and then took out his own pistol, fumbled with it for a moment, and started shooting. One bullet struck Chinetti in the thumb; Chinetti and Currie ran from the office, knocking Killelea back into some shelves in the process. Killelea emptied his pistol into Shea at close range and then, while Shea was on the floor with five bullet wounds, battered Shea's face repeatedly.

Killelea then ran out into the intersection of the two main streets on which the gasoline station faced and, according to the testimony of eyewitnesses, began jumping up and down, banging on passing cars and yelling, "The world's come to an end," and something about getting gasoline for the cars. The driver of one vehicle which Killelea stopped in the intersection testified that Killelea opened the door of his car and grabbed him by the arm and, when the driver warned him to stop, took out his court officer's badge and showed it while yelling something about someone having a heart attack or a bad heart.

Killelea then entered his own car, which was parked in front of the gasoline station, and drove off. Before reaching his home, according to Killelea's testimony, he stopped somewhere and removed his license plates and put the plates from some other car on his own car.

Killelea's wife was at home when he arrived there. She testified that Killelea was crouched over, his eyes were "beaming," and he curled up in a corner of the kitchen; he was screaming and yelling and trying to persuade her to come with him; he raised a closed fist at her as if to strike her and then fell into her lap and started crying and told her he loved her.

After gathering up a handgun, a rifle and some ammunition, Killelea left. He proceeded to a local café, taking down the telephone number there so that he could, through

the bartender, contact his wife at a later time and arrange for her to meet him. He then abandoned his own car (leaving the rifle) and took a taxicab to a motel in Quincy where he registered under the name of a court officer known to him.

Later that night Paul Bertocchi, a friend of Killelea's, visited Killelea at the motel. Bertocchi testified that Killelea asked him if he knew what was going on and if he was "with" Killelea, and that Killelea told him that they and their families had to get to Canada because of the revolution. When Bertocchi tried to tell Killelea that he had killed an innocent bystander, someone who was not part of the "revolution," Killelea jumped up and said Bertocchi was crazy and that the kid he shot had picked up a gun, pointed it at him and tried to kill him.

Killelea talked at length to Bertocchi about a revolution. He examined a newspaper and the television for news of revolt. Bertocchi, aided by Stanton, who by that time had arrived, persuaded Killelea to surrender himself at a police station. There was testimony by Bertocchi that Killelea warned the police of the revolution.

The defense presented two psychiatrists who testified in detail to Killelea's background and the effect on his mental state of certain significant events, the heart attack in particular. Killelea regressed, according to the psychiatrists, from a state of fear and anxiety to a state of psychosis.

The psychiatrists further testified to the effect on Killelea of a speech by the Governor on December 7, 1973, concerning the gasoline shortage, and the sight of the soldiers and artillery near the court house on the morning of December 8, 1973. There was expert testimony that Killelea's actions on December 8, before the killing, were consistent with the vigilance and suspicion of a person in a paranoid state.

Both experts were of opinion that Killelea was not criminally responsibile for the crimes within the meaning of *Commonwealth* v. *McHoul*, 352 Mass. 544 (1967).

To rebut the defense experts, the Commonwealth called

a psychiatrist who had examined Killelea on December 10, 1973, at the Municipal Court of the Dorchester District. This witness testified that at that time he was unable to make a diagnosis of mental illness, but that, based on certain information supplied by Killelea's family, he had recommended that Killelea be examined further at a psychiatric facility. The expert was of opinion that on December 8, 1973, Killelea was not suffering from paranoia, and stated that his own interest and work in psychopharmacology led him to be concerned that the combination of drugs ingested by Killelea "may have had something to do with the action that took place [on that date]." He further testified that the consumption of alcohol has been known to cause increased hostility in some individuals, and that the most frequent side effect of the use of marihuana is an increase in paranoia.

1. In his closing argument to the jury, the prosecutor made the following remarks: "The Commonwealth quite bluntly and simply says 'This man killed Kevin Shea and he should be held criminally responsible for his act.' His defense is 'Yes, yes, he killed him, but because of his mental state at the time of the crime, he should not be held criminally responsible. *He should be set free.*' "

". . . [L]et's look at the defense of insanity. What do we mean by insanity? The Judge will give you the law on insanity, give you the law as it's found in the *McHoul* case, and you will be bound by the law that he gives you. But, basically it says that because of a mental disease or defect, his state of mind at the time of the crime, that he should not be held criminally responsible *and should be set free.*"

". . . [D]espite the fact that I submit to you you can look at every witness . . . in terms of the defense of this case and not find any evidence of insanity, that doesn't prevent . . . [the defense experts from] telling you this man's insane, he shouldn't be held criminally responsible, *he ought to be set free.*"

"Well, . . . [look at] what happened to [Killelea] over the course of his treatment . . . [after the crime]. Within a day or two, the guy was wandering around the grounds [of

the psychiatric treatment facility]. Here's a man, who's committed a brutal murder, and if [the defense experts] feel he got paranoia, paranoia, [*sic*] they don't believe it, because they are not acting consistently. *He's home, he's out on the street, he's with the public*" (emphasis added).

Counsel for the defense, after the prosecutor had concluded his closing remarks, requested that the judge correct the allegedly improper references to setting the defendant free if he were found not guilty by reason of insanity, since such a verdict "does not mean that [the defendant] ought to be set free." The judge agreed to do so.

In his charge to the jury, however, the judge instructed as follows: "Now, the comments of counsel during the course of their openings and closings are not to be considered as evidence. . . . If any of the counsel gave you any indication as to what their view of the law was which is different from what I am giving you, what I say to you controls.

"The Assistant District Attorney may have indicated to you that if you found this defendant not guilty by reason of insanity, that he would walk the street. That is no consideration of yours, what happens to him if he's found guilty of murder in the first degree or not guilty by reason of insanity. That is of no consequence at all. . . . [I]t is not your consideration. Let the chips fall where they may."

When the judge had completed his charge, counsel for the defense renewed his request to the judge to correct the allegedly improper statements of the prosecutor. This request was denied by the judge and the defendant's exception was noted.

The defendant contends that the prosecutor's remarks were sufficiently prejudicial to his case to require reversal of his convictions and the granting of a new trial. He further argues that, even if it be assumed that the judge in his charge to the jury could have corrected the prejudice occasioned by these remarks, the judge's instructions here fell short of curing the prejudice and left the jury free to infer that an acquittal by reason of insanity would in fact result in the defendant's gaining his freedom.

Commonwealth *v.* Killelea.

We agree with these assertions for the reasons set forth *infra.* Consequently, we reverse the judgments and order a new trial at which the defendant, if he so requests, will be entitled to an instruction on the consequences of a verdict of not guilty by reason of insanity. *Commonwealth* v. *Mutina,* 366 Mass. 810 (1975).[1]

It becomes clear that reversal of the judgments is required when it is noted that the prosecutor's comments misstated the law of this Commonwealth as it relates to the ultimate result of a jury verdict of not guilty by reason of insanity. See *State* v. *Jordan,* 80 Ariz. 193, 197-198 (1956); *People* v. *Sorenson,* 231 Cal. App. 2d 88, 92 (1964), and cases cited; *Register* v. *State,* 121 Fla. 9, 11 (1935). Cf. *Evalt* v. *United States,* 359 F.2d 534, 546 (9th Cir. 1966). See *United States* v. *Birrell,* 421 F.2d 665, 666 (9th Cir. 1970); *Wise* v. *State,* 251 Ala. 660, 664-665 (1948); *State* v. *Makal,* 104 Ariz. 476, 478 (1969); *Williams* v. *State,* 68 So. 2d 583 (Fla. 1953); *People* v. *Lewis,* 37 Mich. App. 548, 552-554 (1972), and cases cited; *Smith* v. *State,* 220 So. 2d 313, 316-317 (Miss. 1969); *State* v. *Nickens,* 403 S.W.2d 582, 587-588 (Mo. 1966) (alternative holding); Annot., 44 A.L.R.2d 978 (1955) and Later Case Service (1969 and Supp. 1976). The defendant correctly points out on appeal, as his counsel did shortly after the prejudicial remarks were proffered, that it does not follow necessarily from such a verdict that this (or any) defendant will be thereafter free in the usual sense of the word.

Indeed, in the case of this defendant, the implication

---

[1] The trial of this case took place in January, 1975, and *Mutina* was decided on February 11, 1975. In that case we said that the decision was to be applied only to all trials and retrials held thereafter. 366 Mass. at 823 n.12. The defendant's motion for a new trial was argued and denied after the decision in *Mutina* was rendered by this court. Though the defendant argues persuasively that the *Mutina* holding should be applied to cases on appeal at the time *Mutina* was decided and in which the issue properly was preserved for appeal, we emphasize that we are not so holding in this opinion. Our conclusion that the defendant here is to have a new trial is impelled not by consideration of the *Mutina* holding, but by reason of an improper and prejudicial argument of the prosecutor which would have required reversal of the judgments even if the *Mutina* case had never been decided.

that he would be free to walk the street was probably unwarranted. We observe that the prosecutor thoroughly questioned one of the defense experts on cross-examination and recross-examination, revealing that paranoia is "a hard illness to cure," i.e., it is "virtually incurable"; that Killelea evidenced a potential for paranoia even when the doctor released him to the custody of his family for a five-day period after preliminary examinations at a psychiatric facility; and that the expert was of opinion that Killelea was still suffering from paranoia in a compensated form and could be dangerous if not given further treatment.

Based on this prognosis and the recommendation for further treatment it is probable that, had the jury returned verdicts of not guilty by reason of insanity, the judge would have ordered that Killelea be hospitalized for observation at a State facility for the mentally ill pursuant to G. L. c. 123, § 16 (*a*). General Laws c. 123, § 16 (*b*), further provides for a procedure whereby, on petition of a district attorney or hospital official, and after a hearing at which certain findings are made by a judge having jurisdiction of the criminal case (see G. L. c. 123, § 8 [*c*] and [*d*]),[2] an order of commitment to a facility for the mentally ill *must* issue. Such an order, initially valid for a six-month period, may be extended thereafter for additional periods of one year's duration. G. L. c. 123, § 16 (*c*). A district attorney must be apprised of any hearing relating to a person committed under court order, and has the right to represent the public interest at all such proceedings. G. L. c. 123, § 16 (*d*).

Once a judge has committed an individual found not guilty by reason of insanity, restrictions placed on such an individual's movements may not be removed unless a judge approves the removal, and, most significantly, the proper hospital official must notify the judge and the dis-

---

[2] Under these statutes, the findings which must be made by a judge as a prerequisite to any commitment order are (1) that the individual is mentally ill; and (2) that discharge of the individual would create a likelihood of serious harm *or* that failure to retain the individual in strict custody would create a likelihood of serious harm.

trict attorney who have or had jurisdiction of the criminal case if discharge of the individual from commitment is contemplated. The district attorney may then petition the court for further commitment of the individual, and he cannot be released for at least thirty days after the district attorney is notified of the intent to release. G. L. c. 123, § 16 (*e*).

Thus, it is clear from a perusal of the relevant statute that, contrary to the implication made by the prosecutor on three occasions in his closing, there is no automatic connection between acquittal by reason of insanity and a relinquishment of control over the person acquitted.

Other cases decided by this court in which we held that improper statements by a prosecutor in his closing argument did not require reversal or the declaration of a mistrial are not controlling here. See *Commonwealth* v. *Stone,* 366 Mass. 506, 515 (1974); *Commonwealth* v. *Lussier,* 364 Mass. 414, 424-425 (1973); *Commonwealth* v. *Nordstrom,* 364 Mass. 310, 313-314 (1973); *Commonwealth* v. *De-Christoforo,* 360 Mass. 531, 536-539 (1971), rev'd sub nom. *DeChristoforo* v. *Donnelly,* 473 F.2d 1236 (1st Cir. 1973), rev'd, 416 U.S. 637 (1974). In the decisions mentioned, either exceptions were not saved or no request for a curative instruction was made. Considering this state of affairs and the fact that the judges in those respective cases gave the general charge to the jury that closing arguments are not evidence to be weighed by the jury, we found no error so prejudicial as to justify reversal of the convictions or the declaring of a mistrial.

In this case, however, timely objection was made to the prejudicial remarks, a corrective instruction was requested, and exceptions duly were saved. Though the judge instructed the jury that counsel's comments are not evidence, we do not think the judge went far enough in emphasizing the particulars in which the prosecutor's argument was grossly improper. See *Commonwealth* v. *Cabot,* 241 Mass. 131, 150-151 (1922). Indeed, the defendant argues that the language chosen by the judge as corrective merely exacerbated the prejudice. Whatever the validity

of that comment, we think it could be persuasively argued that the only effective curative language here would have been an instruction which described the statutory provisions which would apply in the event of the return of verdicts of not guilty by reason of insanity.

We turn now to discussion of those issues argued by the defendant which seem likely to arise at retrial of these indictments.

2. The trial judge did not abuse his discretion in denying the defendant's motion to propound certain questions to prospective jurors to determine whether they harbored any bias, prejudice or preconceived attitudes toward psychiatrists or the defense of insanity. At the time this motion was denied, the statute governing examination of jurors left the decision to go beyond certain mandatory questions up to the judge in the exercise of his sound discretion. G. L. c. 234, § 28, as amended by St. 1973, c. 919. *Commonwealth* v. *Harrison,* 366 Mass. 366, 371, 373-374 (1975). *Commonwealth* v. *Lumley,* 367 Mass. 213, 216 (1975).

On retrial of this defendant, however, if defense counsel should request the judge to inquire into matters such as possible bias or prejudice against psychiatrists or some unwillingness to accept the concept of irresponsibility because of mental disease or defect, the judge must consider a recent amendment to G. L. c. 234, § 28, which now mandates inquiry (in certain circumstances) into "community attitudes ... or possible preconceived opinions toward the credibility of certain classes of persons." G. L. c. 234, § 28, as amended through St. 1975, c. 335. For the reasons set forth in *Commonwealth* v. *Ricard,* 355 Mass. 509, 511-512 (1969),[3] it appears to us a doubtful proposition that questions of this general nature need be asked in every case involving testimony by psychiatrists and the defense of

---

[3] In *Ricard* we said: "It may not be assumed that there is a general prejudice against psychiatrists and a general rejection of the concept of irresponsibility because of mental illness or defect. There appears slight chance that pre-trial inquiry in respect of the defence of criminal irresponsibility would tend to assure a fairer and more competent jury to judge that issue."

insanity. In any event we do not have before us, of course, any proposed specific questions which might be posed; moreover, the rulings thereon will lie in the sound discretion of the judge.

3. Over the defendant's objections and exceptions, the prosecutor elicited, in cross-examination of two psychiatrists who were called to the stand by the defendant, evidence of several prior arrests of the defendant for assault and battery. Clearly the incidents were not introduced in such a way as to make them relevant to affect the credibility of the witnesses or the defendant as contemplated by G. L. c. 233, § 21. In the context in which the questioning occurred, the design of the inquiries appears to have been to shake the foundation of the defense experts' opinions rather than to focus on the defendant's prior criminality. It was proper for the prosecution to attempt to undermine the expert testimony on the defendant's behalf by attempting to demonstrate that Killelea was not candid in revealing his prior history to the doctors. We have no way of knowing in what context similar questions will be asked at a new trial, if asked at all. In the circumstances shown here, the judge's rulings were clearly within his discretion.

4. We cannot say that it was error for the judge to exclude evidence that the defendant was unfamiliar with guns. The evidence was offered by the defense as relevant to the defendant's claim of self-defense and his assertion that he thought that Shea had pointed a real gun, not a replica, at the defendant. On that premise the testimony might well have been admitted. In the entire context before us, including the judge's charge, the exclusion of the evidence, if error at all, was harmless.

5. Other assignments of error, all of which are directed toward questions of evidence, are not likely to arise on a retrial of these indictments, at least not in the context in which they arose in the record before us.

6. The judgments are reversed, the verdicts are set aside, and there shall be a new trial on the indictments.

*So ordered.*