572 So.2d 1346 (1990)
Frederick NOWITZKE, Appellant,
v.
STATE of Florida, Appellee.
No. 71729.
Supreme Court of Florida.
December 6, 1990.
*1348 James Marion Moorman, Public Defender and Steven L. Bolotin, Asst. Public Defender, Tenth Judicial Circuit, Bartow, for appellant.
Robert A. Butterworth, Atty. Gen., and William L. Munsey, Jr., Asst. Atty. Gen., Tampa, for appellee.
PER CURIAM.
Frederick Nowitzke appeals two convictions for first-degree murder and one conviction for attempted murder as well as the imposition of the death penalty.[1] We reverse the convictions, vacate the sentence, and remand for a new trial.
At the time of the shootings in this case, Nowitzke lived with his mother Frances, his stepfather Clay Carroll, and two of Clay's children, Lori and Bret. Clay testified that on November 16, 1985 he and Bret were watching TV while Frances and Lori prepared dinner. Nowitzke came home, went into the bathroom, then went back outside through the patio and back door. After dinner, Lori left to baby-sit, and Clay and Bret watched more TV. Nowitzke reentered the house and went to his room where Frances spoke with him for about twenty minutes. When they emerged, Clay noticed that Nowitzke had a shotgun in his hand and another gun strapped to his side. Clay grabbed Nowitzke, knocked him against the wall and took the shotgun away. Nowitzke then pulled out the other gun and shot Clay in the head. Although injured, Clay did not lose consciousness and heard more shots. After Nowitzke left, Clay discovered the bodies of Frances and Bret lying on the floor. Frances had a gunshot wound in the back of her head; Bret had a gunshot wound in his right temple and another in his left flank. Frances and Bret both died from the head injuries. Clay was hospitalized for several weeks, but recovered following surgery for a fractured jaw.
Witnesses testified that several months before the shootings, Nowitzke began acting strangely. He was sure people were watching him; he talked about a black raven-type bird that followed him everywhere; he made "weird and bizarre" statements; he appeared suicidal and was obsessed with a lake, continually remarking that the bottom of the lake was calling to him and that there was a doorway through the lake. Witnesses who saw Nowitzke on the day before the shootings testified that he was worse than usual. They observed that he was unresponsive, detached, and confused.
A family history revealed that Nowitzke's grandmother was diagnosed in the 1930s as having "dementia praecox," commonly known today as schizophrenia, and died in a New Jersey state hospital. Nowitzke's great-grandfather spent the last ten years of his life in a mental institution in Italy, in a catatonic, schizophrenic state.
After Nowitzke's arrest on the night of the shootings, police videotaped an interview with the defendant in which he confessed. He was charged with first-degree murder of his mother and stepbrother and with attempted first-degree murder of his stepfather. The court postponed the trial because it found Nowitzke incompetent to stand trial. Nowitzke was hospitalized at *1349 the North Florida Evaluation and Treatment Center for six months. When he was pronounced competent, he was returned, tried, and found guilty on all counts. After the penalty phase, the jury recommended life imprisonment for the murder of Frances Carroll, and death (by a 7-to-5 vote) for the murder of Bret Carroll. The judge sentenced Nowitzke to life imprisonment for the murder of Frances, death for the murder of Bret, and imposed a consecutive prison sentence of seventeen years on the attempted murder charge.
Nowitzke raises multiple claims, two of which we find dispositive. First, Nowitzke claims that the trial court erred in refusing to order a second competency hearing immediately prior to trial. On the Friday before the trial was to begin, the prosecution offered Nowitzke concurrent life sentences on the murder charges and a consecutive twenty-two-year sentence on the attempted murder charge in return for a guilty plea. When his attorney conveyed the plea offer, Nowitzke rejected it, stating that he believed he would be released on July 4, 1989 because it was Independence Day and because of the number of letters in his three names. Nowitzke stated he obtained this information from a judge in his dreams. He laughed at the possibility of a death sentence, telling his lawyers that the trial was a necessary "step" he must go through; but since he would be spiritually released on July 4, 1989, he could not be executed. Nowitzke's attorney conveyed this information to the judge and moved for a competency hearing. The judge summarily denied the motion on the basis of the competency evaluation made three months earlier when Nowitzke had been returned for trial from the North Florida Treatment Center. We find that the trial judge erred in failing to conduct a competency hearing.
Under both Florida and federal law, it is well settled that due process prohibits a person accused of a crime from being proceeded against while incompetent. Lane v. State, 388 So.2d 1022, 1024-25 (Fla. 1980) (and cases cited therein). Florida Rule of Criminal Procedure 3.210 unambiguously requires the trial court to order a competency examination and conduct a hearing when it "has reasonable ground to believe that the defendant is not mentally competent to proceed." This obligation is a continuing one.
In Pridgen v. State, 531 So.2d 951 (Fla. 1988), we quoted from Drope v. Missouri, 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975), wherein the United States Supreme Court recognized:
Even when a defendant is competent at the commencement of his trial, a trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial.
Pridgen, 531 So.2d at 954 (quoting Drope, 420 U.S. at 180-81, 95 S.Ct. at 908). We then noted:
Florida courts have also held that the determination of the defendant's mental condition during trial may require the trial judge to suspend proceedings and order a competency hearing. Scott v. State, 420 So.2d 595 (Fla. 1982); Holmes v. State, 494 So.2d 230 (Fla. 3d DCA 1986). See Lane v. State, 388 So.2d 1022 (Fla. 1980) (finding of competency to stand trial made nine months before does not control in view of evidence of possible incompetency presented by experts at hearing held on eve of trial).
Pridgen, 531 So.2d at 954.
Thus, a prior determination of competency does not control when new evidence suggests the defendant is at the current time incompetent. See also Lane, 388 So.2d at 1022. In this case, defense counsel presented ample reasonable grounds to believe that Nowitzke might be incompetent. See Scott v. State, 420 So.2d 595, 597 (Fla. 1982) (a finding of incompetency is based on "whether there is reasonable ground to believe the defendant may be incompetent, not whether he is incompetent"). While refusing a plea offer in itself is not evidence of incompetence, here the reasons Nowitzke gave for refusing the *1350 offer indicate a lack of rational thought process such that it is doubtful whether Nowitzke had the present ability to assist his attorneys or understand the proceedings against him. Thus, the trial court should have held a second competency hearing.
We also are persuaded that Nowitzke was denied a fair trial by the prosecutorial misconduct that permeated this case. We find error in the prejudicial admission of irrelevant and deliberately misleading evidence repeatedly elicited by the state attorney over appropriate objection. While isolated incidents of overreaching may or may not warrant a mistrial, in this case the cumulative effect of one impropriety after another was so overwhelming as to deprive Nowitzke of a fair trial. We examine the more egregious examples below.
First, Nowitzke called Dr. Emanual Tanay to support his defense that he was insane at the time of the crimes charged. Dr. Tanay testified that in his opinion Nowitzke was legally insane, under the M'Naghten standard, on November 16, 1985 when the shootings occurred. Dr. Tanay described Nowitzke as "one of the most severe psychotics that I have seen while in jail."
During cross-examination, the state attorney asked Dr. Tanay about a speech he made some ten years earlier to the American Academy of Forensic Sciences. The apparent purpose of this inquiry was to elicit the alleged accusation of a Dr. Thomas Szasz  who had nothing to do with this case  that Dr. Tanay was a "hired gun." After establishing the fact that Dr. Tanay had given the speech and that Dr. Szasz had been mentioned in it, the state attorney proceeded as follows:
Q [By Mr. Schaub] Now, Doctor Thomas Szasz is a recognized expert, is he not, who you mentioned here?
A [By Dr. Tanay] No. I am facetiously saying, "How can he be an expert if he doesn't ever get involved in the process?" He is a psychiatrist, but he is a person who indeed, in my opinion, is not a suitable person to be an expert because he does not know the subject matter.
Q [By Mr. Schaub] Doctor Szasz is from Syracuse University; isn't he?
A [By Dr. Tanay] Yes, he is.
Q [By Mr. Schaub] Probably the best known psychiatrist in the country today; is he not?
A [By Dr. Tanay] Oh, I don't think so at all. I think he's a person who has been generally recognized as holding views that are really bordering on the ridiculous.
Q [By Mr. Schaub] I didn't understand your answer.
A [By Dr. Tanay] My answer, sir, is that Doctor Szasz' views are generally held in great disrespect in psychiatry.
Q [By Mr. Schaub] Why do you accuse him of that? Is that because he called you once a hired gun?
Defense counsel objected and asked to approach the bench. The following proceedings ensued:
MR. SLATER [defense counsel]: Move for a mistrial. Mr. Schaub knows better than that.
MR. SCHAUB: I don't know that at all. That's exactly what I'm setting out to prove.
MR. SLATER: Accusing this doctor as a hired gun is the most inflammatory thing Mr. Schaub has said.
I move for a mistrial and I move that the Court sanction Mr. Schaub for such a statement.
THE COURT: Mr. Schaub 
MR. SLATER: I mean, my Lord.
THE COURT: Mr. Schaub, I will deny the motion for a mistrial, but I think you should 
MR. SCHAUB: I have it right here. He said it himself.
THE COURT: Ask him if he said it.
MR. SCHAUB: He said the man accused him of being a hired gun. No, sir, I'm not inventing this.

*1351 MR. SLATER: Who said this?
MR. SCHAUB: Tanay said that Szasz had accused him of being a hired gun. And that's what I'm trying to show.
Defense counsel asked for a curative instruction to have the jury disregard the comment. The following then took place, before the jury:
THE COURT: The Jury will disregard the last question or statement, whichever it was, by Mr. Schaub in regards to the hired gun. There's no prior proper predicate laid for that.
Q [By Mr. Schaub] Did you or did you not say that Doctor Thomas Szasz had accused you of being a hired gun?
MR. SLATER: Objection. Irrelevant.
Q (By Mr. Schaub) I'll direct your attention to a 
MR. SLATER: Excuse me, Mr. Schaub.
MR. SCHAUB: Well, I'm going to lay a predicate.
THE COURT: When he's finished, I'll let you object. Go ahead.
Q [By Mr. Schaub] This was in the course of a debate that you and he had called "Hero or Hoax" concerning the validity of forensic psychiatry.
I believe you had it in Detroit on November 8, 1982, before a Jewish organization.
MR. SLATER: Objection. Irrelevant and immaterial.
THE COURT: What is your objection?
MR. SLATER: Irrelevant and immaterial.
MR. SCHAUB: I don't think it's irrelevant, Your Honor.
THE COURT: I'll overrule the objection. Did you or not say that? Answer his question?
THE WITNESS: I recall taking part in a debate, Your Honor. I do not recall if I made that specific statement about Doctor Szasz or made that statement that is being attributed to me. I don't recall that. I do recall taking part in a debate.
The state attorney then produced a transcript of the debate to refresh Dr. Tanay's memory. Dr. Tanay explained that the debate focused on the merits of civil commitment, and in that context, "Doctor Szasz has called psychiatrists generally like me hired guns." Although the defense continued to object to the relevancy of this exchange, the prosecutor continued to bait the witness:
Q [By Mr. Schaub] My statement was correct; was it not, Doctor, then?
MR. SLATER: Excuse me 
Q [By Mr. Schaub]  that "Doctor Szasz has called psychiatrists like me hired guns"?
A [By Dr. Tanay] No, sir. You said that he called me. That's what you said, sir.
That is not accurate.
Defense counsel once again objected to the prosecutor's tactic:
MR. SLATER: Your Honor, I have an objection. Obviously, it has no relevancy at all to this particular proceedings.
The only purpose of it is for Mr. Schaub to inflame the Jury on irrelevant and immaterial facts regarding something to do with civil commitments; nothing to do with the area of criminal law, nothing to do with the issue of insanity, nothing to do with the issue regarding Rick Nowitzke's sanity or insanity or competency.
It's absolutely ludicrous that this has any bearing in this court.
MR. SCHAUB: There's nothing about civil here, Your Honor.
THE COURT: Mr. Slater, I'm prone to disagree with you in that this man has been offered as [an] expert, testifying about the condition of your client of an affair that took place in November of '85. And if he has made statements that the State wishes to bring in, I think they should be allowed to, that differ with his present situation  I'm not saying that *1352 I'm endorsing either statement by him or by you or either side. All I'm saying is that he has a right to bring them in.
I want to ask him now or instruct him now to move on. He's done that, and it's sufficient.
The prosecutor then buttressed this testimony by emphasizing in closing argument that "we [then] heard from I think someone Doctor Szasz called the hired gun, Doctor Emanuel Tanay of Detroit."
The trial court erred in allowing the jury to hear this entire exchange, which was totally irrelevant, improper, and misleading. The personal views of a nontestifying expert on the wisdom of the legislative policy decision to provide for civil commitment, or on the ethics of those psychiatrists who participate in the process, were totally irrelevant to any issue in this trial, including the issue of Dr. Tanay's credibility. See Garron v. State, 528 So.2d 353, 357 (Fla. 1988).
Although not entirely clear, it appears that the state attorney was attempting to impeach Dr. Tanay. However, this method of impeachment is improper. One impeaches an expert's opinion by the introduction of a contrary opinion based on the same facts. See Schwab v. Tolley, 345 So.2d 747 (Fla. 4th DCA 1977). It is improper to impeach an expert witness by eliciting from another witness what he thinks of that expert. See Carver v. Orange County, 444 So.2d 452, 454 (Fla. 5th DCA 1984). Thus, had Dr. Szasz appeared in person, he would have been precluded from testifying that Dr. Tanay was a "hired gun." See Ecker v. National Roofing of Miami, Inc., 201 So.2d 586, 588 (Fla. 3d DCA 1967) ("A trial should not be turned into a debate on irrelevant and immaterial issues such as the reputation of one expert witness, as determined or judged by the personal opinion of another expert witness for the other side."). The introduction of Dr. Szasz' opinion was clearly erroneous. It also violated Nowitzke's constitutional right to confront witnesses. Art. I, § 16(a), Fla. Const.; U.S. Const. amend. VI.
This exchange was followed by the state's attempt to impugn the integrity of Dr. Tanay by accusing him of charging $600 an hour for a deposition after he testified that he charged $150 an hour. While the prosecution may properly inquire as to the amount an expert receives in compensation, see Langston v. King, 410 So.2d 179 (Fla. 4th DCA 1982), here the prosecution clearly exceeded the boundaries of proper impeachment. The prosecution had Dr. Tanay's bill, which itemized the expenses.[2] Yet, the state attorney cross-examined Dr. Tanay as follows:
Q [By Mr. Schaub] Doctor, of course, you're getting paid for being here today; are you not?
A [By Dr. Tanay] Yes.
Q [By Mr. Schaub] And what do you normally charge for your services?

*1353 A [By Dr. Tanay] $150 an hour.
Q [By Mr. Schaub] Now, do you recall the last time I came to Detroit to depose you?
A [By Dr. Tanay] I recall you being there, yes.
Q [By Mr. Schaub] We spent exactly three hours in a deposition; did we not? I think it was three hours to the minute?
A [By Dr. Tanay] I don't recall the duration.
Q [By Mr. Schaub] I told you it would be three hours and I think I bragged that we did it in exactly three hours. We started at 2:00 and completed at 5:00?
A [By Dr. Tanay] I don't question whether it was so. I don't specifically recall if we started at 3:00 or 9:00 in the morning. I do recall you being there.
The state attorney had the clerk mark the bill for identification. He then turned his attention back to Dr. Tanay, and challenged him:
Q (By Mr. Schaub) I submit what has been marked for identification purposes as State's Exhibit Number 62, and ask you if this doesn't show that you charged 18 hundred dollars for that three hour deposition?
Defense counsel objected. The state attorney replied that the question was relevant "[t]o show why he's testifying the way he is," and also suggested that he was impeaching Dr. Tanay with an inconsistent statement:
THE COURT: He's testified he gets $150 an hour. Are you trying to show something inconsistent?
MR. SCHAUB: This shows $600 an hour.
THE COURT: If it's an inconsistent statement, I might agree with you.
The trial court overruled the defense objection, and the state attorney proceeded with his tactic designed to make Dr. Tanay appear to be a liar:
Q (By Mr. Schaub) You charged 18 hundred dollars; did you not, for a three-hour deposition?
A [Dr. Tanay] Sir, this is an outrageous misstatement. What you just handed to this court shows that I charged, it's says so here, "Review of entire file including additional material submitted, six hours; review of three tape recordings, three hours; giving of deposition, 2 to 5, three hours; total 18 hundred." How can you make such broad statements in this courtroom? That is terrible.
Q [Mr. Schaub] Are you asking me a question? I'd like to ask the questions.
A [Dr. Tanay] That's terrible. That's terrible. I have never seen anything like that.
THE COURT: Gentleman, Doctor 
Defense counsel asked to approach the bench and said:
[Mr. Slater] Your Honor, I'm going to move for a mistrial. I cannot believe the means in which Mr. Schaub will go about in making misrepresentations before this court. Mr. Schaub just tried to mislead this Jury.
I want the Court to take a look at this particular document.
THE COURT: He's just read this document. It's what it was and I think the doctor made it perfectly clear.
MR. SLATER: And it makes the doctor mad because the doctor sees this Prosecutor here trying to mislead this Court and this Jury. And I move for a mistrial based upon this person's misleading statements. I can't believe such a thing would be said.
MR. SCHAUB: He's charged 18 hundred dollars for a three-hour deposition.
It is obvious from the record that the prosecution was well aware of the services the bill covered, but nevertheless insisted in front of the jury that Dr. Tanay charged $600 an hour.
Although the foregoing are the most egregious examples of the improper cross-examination of Dr. Tanay, they are not the only examples. At various points throughout the cross-examination, the state attorney *1354 stated his personal opinions, misstated Dr. Tanay's answers, insulted the witness generally, cast aspersions on his home city of Detroit, and ignored the trial court's rulings by persisting in irrelevant lines of questioning after defense objections had been sustained. We are compelled to remind lawyers that when they take the oath as members of The Florida Bar, they pledge to "abstain from all offensive personality and advance no fact prejudicial to the honor or reputation of a party or witness, unless required by the justice of the cause with which I am charged." Oath of Admission.
Nowitzke's next expert witness fared no better. The state continued its tactic of eliciting irrelevant, improper, and misleading testimony from Dr. Rufus Vaughn. Dr. Vaughn had served as a psychiatrist at the North Florida Evaluation and Treatment Center from 1982 until January 30, 1987. When Nowitzke was committed to the center as incompetent to stand trial, Dr. Vaughn was his treating physician. During that period of time, Dr. Vaughn had not examined Nowitzke on the issue of sanity or insanity at the time of the offense. Shortly before trial, Dr. Vaughn retired from the Treatment Center.
Prior to trial, the state attorney, aware that Dr. Vaughn had pronounced Nowitzke competent to stand trial, asked him to render an opinion on Nowitzke's sanity at the time of the offense. Dr. Vaughn reviewed the records, viewed the videotape of the confession, and interviewed Nowitzke. He then advised the state attorney before trial that it was his opinion that Nowitzke was insane at the time of the offense. Based on Nowitzke's bizarre associations, combined with his affect, the nature of the crime, and his past history, it was Dr. Vaughn's opinion that Nowitzke was psychotic. Specifically, Dr. Vaughn thought that Nowitzke's disorder was "just classical paranoid schizophrenia." Ultimately, Dr. Vaughn testified on behalf of the defense, and the state was put in the awkward position of attempting to impeach an expert whose opinion it originally had procured.
Over repeated objections, the state attorney again attempted to mislead the jury during Dr. Vaughn's cross-examination. The height of overreaching came, however, when the state asked Dr. Vaughn to confirm that a "stay in a state hospital for the criminally insane is actually about six to eight months [and] is not uncommon." Thus the jury was led to believe that if it found Nowitzke not guilty by reason of insanity, he would be out on the streets within eight months.
Setting aside the attempted mischaracterization of Vaughn's testimony, the overwhelming weight of authority in this and other jurisdictions[3] is that the prosecution cannot suggest to the jury that an acquittal would result in the defendant's release from an asylum in just a few months because the disposition of an insane defendant is neither the concern nor the responsibility of the jury. See Williams v. State, 68 So.2d 583 (Fla. 1953) (reversible error for prosecution to tell jurors that if they should find defendant not guilty by reason of insanity he would be sent to an asylum and soon be released); see also Johnson v. State, 408 So.2d 813, 816 (Fla. 3d DCA 1982) (state's comment that "it was `unheard of' for a person to spend more than two years in the state hospital system if found insane" was prejudicial and should not have been made to jury). Such comments constitute reversible error because *1355 they greatly prejudiced Nowitzke and deprived him of a fair trial.
The trial court also erred in allowing the state to introduce the testimony of a neurosurgeon, Dr. Stephen C. Padar, under the circumstances presented. Dr. Padar had only examined Nowitzke to determine whether he suffered organic brain damage. Although the defense experts never claimed that Nowitzke suffered organic brain damage,[4] the state improperly called this neurosurgeon for "rebuttal." See Donaldson v. State, 369 So.2d 691 (Fla. 1st DCA 1979) (where facts were undisputed by defendant, rebuttal testimony was improper); Garcia v. State, 359 So.2d 17 (Fla. 2d DCA) (reversible error for prosecutor to present rebuttal testimony that did not rebut defendant's testimony), cert. denied, 364 So.2d 891 (Fla. 1978).
This error was then compounded. Although Dr. Padar admitted he was unfamiliar with the definition of insanity under Florida law,[5] the state was permitted to ask him whether Nowitzke was "insane at the time of the commission of these crimes in 1985." Dr. Padar responded that he found no sign to indicate that Nowitzke had been insane. The prosecution then used this answer in its closing arguments to persuade the jury that "the genuine scientist" had opined that Nowitzke was sane. Dr. Padar's opinion on the legal sanity of the defendant at the time of the crime was inadmissible in light of his lack of knowledge of the legal definition of insanity.
The record as a whole indicates, and the state admits, that the prosecution's strategy throughout the entire trial was to discredit the whole notion of psychiatry in general and the insanity defense specifically. We have addressed the impropriety of such an attack in the past, stating:
In response to rebuttal of the insanity defense, the assistant state attorney made several comments during cross-examination of court appointed psychiatrists and during closing argument, which were intended to discredit the insanity defense as a legal defense to the charge of murder. We believe that once the legislature has made the policy decision to accept insanity as a complete defense to a crime, it is not the responsibility of the prosecutor to place that issue before the jury in the form of repeated criticism of the defense in general. Whether that criticism is in the form of cross-examination, closing argument, or any other remark to the jury, it is reversible error to place the issue of the validity of the insanity defense before the trier of fact. To do so could only helplessly confuse the jury. The insanity defense is a policy question that has plagued the courts, legislatures, and governments for decades. It is unnecessary to similarly plague [juries].
Garron v. State, 528 So.2d 353, 357 (Fla. 1988) (emphasis added).
Finally, the state attorney elicited irrelevant and prejudicial rebuttal testimony about the criminal behavior patterns of drug addicts from Roy Hackle, one of the arresting officers.[6] Over numerous defense objections, Hackle testified that he knew drug addicts who both stole from their families to support their drug habits and committed homicides in connection with narcotics deals.
This entire line of questioning was completely improper. Testimony concerning past crimes that did not involve the defendant cannot be introduced to demonstrate that the defendant committed the crimes at issue in the present case. See, e.g., Whitted *1356 v. State, 362 So.2d 668, 673 (Fla. 1978); Jenkins v. State, 533 So.2d 297, 299-300 (Fla. 1st DCA 1988), review denied, 542 So.2d 1334 (Fla. 1989). The only purpose of such testimony is to place prejudicial and misleading inferences in front of the jury. See Whitted, 362 So.2d at 673; Jenkins, 533 So.2d at 300.
The record reveals that these and other instances of misconduct too numerous to list precluded the defendant from the fair and impartial trial to which he is entitled under due process of law. As in Bertolotti v. State, 476 So.2d 130 (Fla. 1985), we are distressed over the lack of propriety and restraint exhibited in the overzealous prosecution of capital cases, and we feel compelled to reiterate:
This Court considers this sort of prosecutorial misconduct, in the face of repeated admonitions against such overreaching, to be grounds for appropriate disciplinary proceedings. It ill becomes those who represent the state in the application of its lawful penalties to themselves ignore the precepts of their profession and their office.
Id. at 133 (emphasis in original).
Nowitzke is entitled to a fair trial and an impartial decision on his insanity defense. Accordingly, we reverse Nowitzke's convictions and remand for a new trial consistent with this opinion.[7]
It is so ordered.
SHAW, C.J., and OVERTON, McDONALD, EHRLICH, BARKETT, GRIMES and KOGAN, JJ., concur.
NOTES
[1] We have jurisdiction pursuant to article V, section 3(b)(1), Florida Constitution.
[2] The bill in question contained the following information:

RE: NOWITZKE, FREDERICK
DATE DESCRIPTION CHARGES
10-1-87 Review of entire file including additional
material submitted.
6 hours $900
10-1-87 Review of three tape recordings.
3 hours $450
10-2-87 Giving of deposition, 2:00 to 5:00 p.m.
3 hours $450
10-6-87 BILLED BALANCE DUE
 $1800

[3] See, e.g., Evalt v. United States, 359 F.2d 534 (9th Cir.1966); Jetton v. State, 435 So.2d 167 (Ala. Crim. App. 1983); State v. Makal, 104 Ariz. 476, 455 P.2d 450 (1969), cert. denied, 404 U.S. 838, 92 S.Ct. 128, 30 L.Ed.2d 71 (1971); People v. Criscione, 125 Cal. App.3d 275, 177 Cal. Rptr. 899 (1981); Dailey v. State, 273 Ind. 595, 406 N.E.2d 1172 (1980); Commonwealth v. Killelea, 370 Mass. 638, 351 N.E.2d 509 (1976); People v. Lewis, 37 Mich. App. 548, 195 N.W.2d 30 (1972); Smith v. State, 220 So.2d 313 (Miss. 1969); State v. Johnson, 267 S.W.2d 642 (Mo. 1954), cert. denied, 351 U.S. 957, 76 S.Ct. 858, 100 L.Ed. 1479 (1956), and cert. denied, 357 U.S. 922, 78 S.Ct. 1364, 2 L.Ed.2d 1366 (1958); State v. Wall, 78 Or. App. 81, 715 P.2d 96, review denied, 301 Or. 241, 720 P.2d 1280 (1986); State v. Myers, 159 W. Va. 353, 222 S.E.2d 300 (1976).
[4] In fact, the defense's witness, Dr. Vaughn, testified that Nowitzke did not suffer organic brain damage.
[5] Florida follows the M'Naghten Rule, which states that "any expert testimony ... to be relevant, must concern whether [defendant] (1) was incapable of distinguishing right from wrong (2) as a result of mental infirmity, disease, or defect." Hall v. State, 568 So.2d 882 (Fla. 1990).
[6] The state attorney also pursued a briefer but similar line of questioning, over defense objections, with another of the arresting officers, Larry Costanzo.
[7] We do not address Nowitzke's claims of errors in the penalty phase. We note, however, that the trial judge never has submitted the written findings to support the death sentence as required by section 921.141(3) of the Florida Statutes (1985). See, e.g., Stewart v. State, 549 So.2d 171 (Fla. 1989), cert. denied, ___ U.S. ___, 110 S.Ct. 3294, 111 L.Ed.2d 802 (1990). We also note that lack of remorse cannot be considered by the sentencing judge as an aggravating factor. See Hill v. State, 549 So.2d 179 (Fla. 1989); Trawick v. State, 473 So.2d 1235 (Fla. 1985), cert. denied, 476 U.S. 1143, 106 S.Ct. 2254, 90 L.Ed.2d 699 (1986).